ESTATE OF JAMES A. ELKINS, JR., DECEASED, MARGARET ELISE JOSEPH AND LESLIE KEITH SASSER, INDEPENDENT EXECUTORS, PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 16597–10.          Filed March 11, 2013.

D owned undivided fractional interests in 64 works of contemporary art.

1. *Held*: In valuing certain of those fractional interests, pursuant to I.R.C. sec. 2703(a)(2) we disregard D's agreement by which he waived his right to institute a partition action with respect to some of the works of art and thereby relinquished an important use of his fractional interests in those works.

2. *Held*, *further*, the total fair market value of D's interests in the art determined. *See* I.R.C. sec. 2031.

*Donald Frederick Wood*, *J. Graham Kenney*, *Harry M. Reasoner*, *Stacey N. Vu*, and *Juliana D. Hunter*, for petitioners.

*Warren P. Simonsen*, *Sharyn M. Ortega*, and *Susan S. Hu*, for respondent.

HALPERN, *Judge*: By notice of deficiency issued to petitioners (notice), respondent determined an estate tax deficiency of $9,068,265. Petitioners (Ms. Sasser and Ms. Joseph) are the coexecutors of the Estate of James A. Elkins, Jr. (estate), and are decedent's daughters. Their brother, James A. Elkins III (James III), who was also a coexecutor of the estate, died on June 10, 2010, less than a month after respondent issued the notice, and will not be replaced as a

coexecutor. The issue to be decided is the total fair market value of decedent's undivided fractional interests in 64 works of art, which interests are includable in decedent's gross estate.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 2006, the year in which decedent died, and all Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

*Residence*

When they filed the petition, petitioners resided in Houston, Texas.

*The Art*

Decedent (sometimes, Mr. Elkins) and Mrs. Elkins purchased 64 works of art (sometimes, when referenced collectively, art) between 1970 and 1999. Mr. and Mrs. Elkins purchased all 64 works during their marriage. The art became community property under Texas law. The art principally consists of works of contemporary art. The collection includes works by a number of famous artists, including Pablo Picasso, Henry Moore, Jackson Pollock, Paul Cezanne, Jasper Johns, Ellsworth Kelly, Cy Twombly, Robert Motherwell, Sam Francis, and David Hockney. Both before and since decedent's death, on February 21, 2006 (valuation date), the art has been displayed primarily in decedent and Mrs. Elkins' family home and at the family office, both in Houston, Texas. Some works are at various other locations in the Houston area or, in one instance, Galveston, Texas. Those other locations are homes belonging to petitioners and to Virginia Arnold Elkins, the widow of James III. One work is on loan to the Museum of Fine Arts, Houston. None of the 64 works have been sold since decedent's death.

*Creation of Fractional Interests in the Art*

*The GRIT Art*

On July 13, 1990, Mr. and Mrs. Elkins each created a grantor retained income trust (GRIT) funded by each's undivided 50% interests in three of the works in the collection:

a large Henry Moore sculpture, a Pablo Picasso drawing, and a Jackson Pollock painting (GRIT art).[1] Each trust was for a 10-year period, during which the grantor retained the "use" of the transferred interests in the art. At the conclusion of the 10-year period, each grantor's interests were to go to the Elkinses' three children, which, in effect, would give them 100% ownership of the GRIT art, one-third each.

Mrs. Elkins died on May 19, 1999, before the expiration of the 10-year period of her GRIT. Pursuant to the terms of her GRIT, her 50% undivided interests in the GRIT art passed to Mr. Elkins. Because Mr. Elkins survived the 10-year term of his GRIT, his original 50% undivided interests in the GRIT art passed to his three children in equal shares so that each received 16.667% interests in the GRIT art. Decedent retained the 50% interests in the GRIT art that he received upon Mrs. Elkins' death, which constitute part of his gross estate.

Decedent and the Elkins children executed a lease agreement (art lease) covering two of the three works of GRIT art (the Picasso drawing and the Pollock painting), made effective "as of the 13th day of July, 2000" (the expiration date of decedent's GRIT). Under the art lease, the Elkins children leased their combined 50% interests in the two works to decedent, in effect allowing him to retain year-round possession of those works. There was an initial lease term, with automatic extensions, unless decedent opted out of an extension, which he never did. Section 10 of the art lease provides, in relevant part, as follows: "*Sale*. Lessors and Lessee each agrees not to sell his or her percentage interest in any item of the * * * [leased artwork] during the Initial Term or any Additional Term without the joinder of * * * [the parties to the art lease] for the purpose of selling the item * * * in its entirety." Section 13 states that the lease and the parties' "rights, duties and obligations" under it "may not be transferred or assigned" without the consent of all parties and that, subject to that restriction on assignment, the lease "shall be binding upon and inure to the benefit of Lessors and Lessee and their respective heirs, representatives, successor and assigns."

---

[1] Mr. and Mrs. Elkins partitioned their community property interests in the GRIT art before creating the GRITs.

The rent due under the lease was left blank in the original agreement and was not computed until May 16, 2006, when Deloitte LLP made a determination of the appropriate monthly rental for the two works. That determination resulted in a finding of rent due of $841,688 for the period from July 13, 2000, through the valuation date. The estate sought to deduct its payment of that amount to the Elkins children. On audit, the parties agreed to reduce the amount of that deduction to $10,000, the propriety of which is not at issue herein.

*The Disclaimer Art*

Under Mrs. Elkins' will, her 50% community property interests in the other 61 works of art passed outright to decedent. Mr. Elkins decided, however, to disclaim a portion of those interests equal in value to the unused unified credit against estate tax, *see* sec. 2010, available to Mrs. Elkins' estate so that the disclaimed portion could pass to the Elkins children free of estate tax. On the basis of appraisals obtained by Mrs. Elkins' estate, decedent disclaimed a 26.945% interest in each of the 61 works (disclaimer art). Pursuant to Mrs. Elkins' will, those fractional interests passed to the Elkins children, one-third each. As a result, each child received an 8.98167% interest in each item of the disclaimer art, and the balance, a 23.055% interest in each item, passed to decedent. Thus, decedent retained a 73.055% interest in each item of the disclaimer art (his original 50% interest plus the additional 23.055% interest received from Mrs. Elkins that he did not disclaim).

On February 14, 2000, shortly after decedent executed his partial disclaimer, decedent and the Elkins children entered into a "Cotenants' Agreement" (cotenants' or original cotenants' agreement) relating to the disclaimer art. In relevant part, the cotenants' agreement provides as follows:

> This Agreement is made as of the 25th day of February, 2000, by and among James A. Elkins, Jr., Margaret Elise Joseph, James A. Elkins, III and Leslie Keith Elkins (hereinafter referred to individually as "*Cotenant*" and collectively as "*Cotenants*"), all of Houston, Texas.
>
> WHEREAS, each Cotenant is the owner of an undivided interest in each item of property described in Exhibit A attached hereto and made a part hereof (hereinafter, all of such property or any part thereof shall be referred to as the "*Property*").

WHEREAS, Cotenants desire to clarify certain of their responsibilities and duties related to the use, possession and care of the Property.

NOW THEREFORE, in consideration of the above and of the mutual covenants contained herein, Cotetants hereby agree as follows:

1. Beginning on the date of this Agreement, each Cotenant shall have the right of possession, dominion, and control of each item of the Property for a total number of days out [of] a twelve month period that is equal to his or her percentage interest in such item times the number of days in such twelve month period. During a short calendar year, the number of days to which a Cotenant is entitled to possession, dominion and control of each item of the Property shall be prorated.

2. Each Cotenant, with respect to the exercise of his or her right of possession, dominion, and control, shall request possession of an item of the Property by giving 30 days' written notice of such request to the Cotenant in possession of such item. The notice shall specify the number of days to which such Cotenant is entitled to possession and the number of days remaining thereof during the twelve month period (or a fewer number of months for a short calendar year). In the event of a conflict among the Cotenants at any time as to which Cotenant is entitled to possession of an item of the Property, Cotenant James A. Elkins, Jr. shall determine which Cotenant is entitled to possession and the number of days remaining thereof.

3. The Cotenant requesting possession (the "Receiving Cotenant") of an item of the Property shall be responsible for arranging and paying for the transport of such item to the Receiving Cotenant's residence.

\* \* \* \* \* \* \*

6. Each Cotenant shall be responsible, to the extent of his or her percentage interest in the Property, for the cost of maintaining and restoring the Property.

7. An item of the Property may only be sold with the unanimous consent of all of the Cotenants. Any net proceeds from the sale of such item shall be payable to the Cotenants in accordance with their respective percentage interests in the Property.

8. This Agreement shall be binding on Cotenants and on their respective heirs, personal representatives, successors and assigns.

9. This Agreement shall be governed and construed under the laws of the State of Texas.

After decedent's GRIT terminated on July 13, 2000, the parties to the cotenants' agreement amended it (amended cotenants' agreement or, when not differentiating between the original and amended agreements, cotenants' agreement), effective as of that date, by incorporating therein one of the three works of GRIT art (the large Henry Moore sculpture that was not included in the art lease). On February 17,

2006, the Elkins children signed the amended cotenants' agreement, both for themselves and (under a January 28, 2000, power of attorney) for decedent.

*Decedent's Will*

Decedent's will provides that his descendants inherit his personal and household effects, which included his undivided fractional ownership interests in the art. Decedent's residuary estate passed to the James A. Elkins, Jr. and Margaret W. Elkins Family Foundation (Elkins Foundation), a bequest that entitles the estate to a charitable contribution deduction under section 2055. The will provides that all estate taxes, plus any interest and penalties, due by reason of decedent's death (but not including taxes due with respect to the assets in Mrs. Elkins' marital trust includable in decedent's gross estate under section 2044) shall be charged against his residuary estate. Thus, any additional estate taxes payable by the estate as a result of this case will correspondingly reduce the distribution to the Elkins Foundation and the charitable contribution deduction with respect thereto.

*Decedent's Estate Tax Return*

Petitioners timely filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (estate tax return), on May 21, 2007, in which they reported a Federal estate tax liability of $102,332,524. Schedule F, Other Miscellaneous Property Not Reportable Under Any Other Schedule, included in decedent's gross estate his 73.055% interests in the 61 works of disclaimer art that were subject to the original cotenants' agreement, valued at $9,497,650, and his 50% interests in the three works of GRIT art (two of which remained subject to the art lease on the valuation date), valued at $2,652,000. Those amounts were derived by, first, determining decedent's pro rata share of the fair market value of the art as determined by Sotheby's, Inc., and, then, applying a 44.75% combined fractional interest discount (for lack of control and marketability), as determined by Deloitte LLP, to those pro rata share amounts. The parties have stipulated a total (undiscounted) fair market value, as of the valuation date, of $24,580,650 for the dis-

claimer art and $10,600,000 for the GRIT art.[2] A list of the 64 works of art, their status as GRIT art or disclaimer art, and the stipulated fair market value of each work is attached to this Opinion as appendix A.

*Notice*

In the notice, respondent determined that decedent's gross estate included his 73.055% interests in the disclaimer art at an undiscounted fair market value of $18,488,504[3] and his 50% interests in the GRIT art at an undiscounted fair market value of $5,300,000. As alternative bases for his using undiscounted values of decedent's fractional interests in the art in computing decedent's taxable estate, respondent determined that (1) the restrictions on the sale of art subject to the cotenants' agreement and fractional interests in art subject to the art lease constituted "an option, agreement, or other right to acquire or use such artwork at a price less than the fair market value" and, alternatively, "a restriction on the right to sell or use the decedent's interest in such artwork" so that, pursuant to section 2703(a)(1) and (2), respectively, decedent's interests in the art covered by those agreements "should be valued without regard to" those restrictions; (2) "the discounts used in calculating the fair market value of Decedent's fractional interests in * * * [the art] are overstated and no discount is appropriate." In addition, because decedent's will provided that all estate taxes were to be paid out of his residuary estate passing to the Elkins Foundation, the notice reduces the deduction for the charitable bequest to that foundation by the amount of the proposed estate tax deficiency, i.e., by the amount of additional estate tax payable by the estate.

---

[2] Sotheby's had derived a date-of-death fair market value of $23,530,650 for the disclaimer art and $9,600,000 for the GRIT art.

[3] That amount is 73.055% of $25,307,650 rather than of $24,580,650, which is the parties' stipulated undiscounted fair market value for the disclaimer art. Thus, the parties now appear to agree that the undiscounted fair market value of decedent's 73.055% interests in the disclaimer art is $17,957,393 (73.055% of $24,580,650), not the $18,488,504 determined in the notice.

*Petition*

In response to the notice, petitioners timely filed the petition. In it, petitioners, in addition to assigning error to the deficiency determined by respondent, seek a refund of estate tax based upon the estate's (1) overvaluation of the art, (2) entitlement to a greater charitable contribution deduction than claimed on the return in an amount equal to the estate tax refund arising out of its overvaluation of the art, and (3) entitlement to deductions for attorney's, accountant's, and appraisal fees and other administration expenses in excess of the amounts estimated on decedent's estate tax return. [4]

*Petitioners' Experts*

In defense of their proposed discounts in valuing decedent's fractional interests in the art, petitioners offered the testimony of three expert witnesses.

*David Nash*

The first, David Nash, has been an appraiser and seller of fine art for over 48 years. He worked at Sotheby's, Inc., for 35 years, was a member of the IRS Art Advisory Panel, and has appraised works for collectors and museums, including the Metropolitan Museum of Art, the Museum of Modern Art, the Art Institute of Chicago, and the National Gallery of Art. The Court accepted Mr. Nash as an expert in the art market, the marketability of art, and art valuation, and we received his written report into evidence as his direct testimony.

In November 2008, before attempting to value decedent's fractional interests in the art as of the valuation date, Mr. Nash viewed each of the 64 works in Houston and met with the Elkins children. He came away from that meeting convinced that any buyer of decedent's interests in the art would have to take into account the fact that the children (whom he refers to as "the other shareholders") are "committed to retaining the art in the family until the last shareholder dies." He was asked to assess the marketability of decedent's

---

[4] The estate's entitlement to an additional deduction for administration expenses is not at issue herein.

interest in each work "rather than viewing the collection as a whole."

He states, preliminarily, that collectors, museums, dealers, art funds, and other investors or speculators constitute the categories of potential buyers for a work of art. He describes auction houses as retailers on consignment, not as purchasers. He then considers each as a potential buyer of decedent's fractional interests in the art. His analysis is informed by the expert report submitted by William T. Miller (discussed *infra*), regarding the expense and likelihood of a successful partition action with respect to the works subject to the cotenants' agreement.

In general, Mr. Nash concludes that all categories of potential buyers of fine art would demand steep discounts from pro rata fair market value for decedent's fractional interests in the art and that auction houses simply do not market fractional interests in fine art, a fact that, in and of itself, would have "a significant [adverse] impact on the marketability of * * * [decedent's fractional] Interests."

Mr. Nash reasons that a collector would be put off by the uncertainty of his ever being able to acquire the whole work, potential disputes with the Elkins children over periods of possession or, alternatively, over his right to sell a particular work and his recognition that, probably, there would be comparable works by the same artist that he could purchase outright. Mr. Nash states that the collector's only motivation for buying a fractional interest in one of the works of art, even at a steep discount, would be "the expectation or hope that the work is so desirable that it will increase in value over time and that eventually it will be possible to sell the whole or acquire all of the outstanding shares".

Mr. Nash states that it is "highly unlikely" that a museum would pay "anything close [to] the pro rata value of the fractional share where they will never know if or when they will be able to obtain full control" and that he did not "know of any situation where a museum has ever paid for a fractional interest in a work of art or a collection * * * [with] no assurance * * * [of ever acquiring] full ownership." He notes, however, that it is common for two museums to jointly purchase a work (or works) of art and take turns exhibiting the work(s) in proportion to their interests. He concludes, however, that museums would not be interested in purchasing

joint interests in art where the coowners would be the Elkins children rather than another museum or institution.

Mr. Nash similarly concludes that dealers, investors, and art funds would have little interest in buying decedent's fractional interests, mainly because of the difficulty in reselling them to collectors or museums, and that the "logistical difficulties and potential litigation would also be unappealing." He notes that it is "common practice" among dealers to jointly purchase artworks with the goal of reselling the works in their entirety but that, because of the Elkins children's determined refusal to sell any of the works outside the family, that option is essentially a nonstarter in this case.

Mr. Nash summarizes the "key factors" making decedent's fractional interests in the art "unappealing" to potential buyers as follows: (1) the inability to sell the art at auction houses, (2) the lack of exclusive possession and the inability to force a sale of the art without litigation against the Elkins children as coowners, (3) possible litigation involving time of possession and proper care, storage, or transportation of the art, and (4) the difficulty or impossibility of insuring the purchased interest or using it as collateral for a loan. Nonetheless, he concludes that speculators "would be willing to purchase * * * [decedent's] interests if appropriately discounted."

In determining the discounted fair market value of decedent's fractional interest in each of the 64 works of art, Mr. Nash divides those works into three categories, which he identifies as categories I–III.

Category I consists of five works that he characterizes as "highly desirable". He states: "Collectors, Dealers, Investors and Museums might be willing to invest in * * * [those] works * * * due to * * * [their] rarity and importance". The five works range in stipulated fair market value from a high of $8 million (Jasper Johns' Figure 4) to a low of $1.5 million (Robert Motherwell's Elegy to Spanish Republic #134), and Mr. Nash's discounts from the pro rata fair market value of decedent's interests in those works are between 50% and 80%.[5]

---

[5] For two of the works, Mr. Nash determines a range of discounted values for decedent's fractional interests therein. Mark L. Mitchell is another

Continued

Category II consists of 19[6] works for which, according to Mr. Nash, "alternate choices could be found and purchased outright * * * [noting that the artworks] are good examples, but not masterpieces by the artist and the artist's reputation is more or less on the same level as in Category I, but will include some artists who might not be so internationally recognized." Mr. Nash concludes that, for those works, "a potential buyer would demand a discount of approximately 80–90% of the pro rata value."

Mr. Nash describes the remaining 40 works, which he places in category III, as "not worth the risk at any level", and he opines that "a potential buyer would demand a discount of approximately 95% of the pro rata value" so that "[a]s a result, these interests have only a nominal value." In reaching that conclusion he notes that, although the works "have a real international value, * * * neither the works themselves nor their creators are in the masterpiece category." He does single out five of the works as having "relatively high underlying values" but concludes that decedent's fractional interests in them still had only nominal values because comparable works by the same artists were readily available, in some cases for less money than the stipulated pro rata fair market values of the examples contained in the Elkins family collection.

On the basis of the foregoing, Mr. Nash finds the discounted fair market value of decedent's interests in the art to be as follows:

| | |
|---|---|
| Category I ............................................................ | $4,336,859 |
| Category II ......................................................... | 976,451 |

---

of petitioners' expert witnesses, whose valuations of the 64 works of art (based, in part, on Mr. Nash's report) are the valuations upon which petitioners rely herein. For each of the two works for which Mr. Nash determined a range of values, Mr. Mitchell adopts the mean between the high and low ends of the range as Mr. Nash's discounted value of decedent's interests.

[6] Mr. Nash lists 1 of the 19 works (Franz Kline's The Hill) as a category II work on an exhibit listing and categorizing all 64 works, but he inexplicably omits that work from an exhibit separately listing the category II works. He does, however, state that "40 interests are in Category III", and, because 5 category I, 19 category II, and 40 category III works total the 64 works under consideration, we conclude that Mr. Nash did, in fact, intend to include the Kline in category II.

Category III .......................................................... 149,056

Total ................................................................. 5,462,366

*William T. Miller*

William T. Miller is licensed to practice law in Texas, and he has been a member of the Texas Bar since 1968. As an attorney he has been involved in a number of partition actions in Texas and has had experience with receivers and agents for liquidating personal property, including works of art. The Court accepted Mr. Miller as an expert on the nature, procedure, time, and cost of partition actions litigated in the Texas courts and received his written report into evidence as his direct testimony, with modifications agreed to by the parties.

Mr. Miller is of the opinion that, in Texas, the "right to partition is absolute" and protected by statute but that "it is also well settled that cotenants 'may expressly or impliedly agree not to partition'". (Citation omitted.) He assumes, for purposes of his report, that paragraph 7 of the cotenants' agreement, requiring unanimous consent of the coowners to the sale of any art, "is, in essence, an agreement * * * not to partition", that, therefore, the coowners "impliedly waived their right [under Texas law] to partition", that that agreement, under Texas law, would be binding on the coowners of the art, but that a Texas court would strike paragraph 8 of the agreement, which binds "heirs, personal representatives, successors and assigns" to the terms thereof (leaving the rest of the agreement intact), as "an invalid restraint on alienation". Alternatively, he notes that the court might choose to "reform" paragraph 8 so that it would "terminate after a reasonable period of time", e.g., the lives of the coowners. Mr. Miller opines that, in any event, "the enforceability of the Cotenants Agreement will be a litigated issue in the Partition Actions." He does not view that fact as a "material element", however, as regards "the procedure, time and costs of a * * * partition action." Like Mr. Nash, Mr. Miller was "instructed that the interests in each Work of Art must be valued individually", with the result that he assumes a separate partition action for each work to be "the standard in determining costs and attorneys' fees."

Mr. Miller states that, if the cotenants' agreement is held to be enforceable, "any further partition action would be prohibited", but he assumes, for purposes of his report, that it would be held to be unenforceable so that partition actions "would proceed through a sale of the Work of Art." He describes the various steps and procedures of Texas partition actions and concludes that a partition by sale of the art (with a division of the proceeds among the coowners) is more likely than a partition in kind (which would involve a time-sharing agreement among the coowners) because the latter "would mean * * * indefinite court supervision." He posits that an adversarial partition action would culminate in a public or private sale of the art by a court-appointed receiver, although the buyer of decedent's fractional interests in the art would be "subject to the risk that his interest could be sold at a sheriff's sale * * * [, which] would substantially reduce the amount that might be recovered".

Mr. Miller states that, most likely, any partition action with respect to the art would entail a two-step procedure: a trial to determine (1) the enforceability of the cotenants' agreement, (2) whether partition by sale or in kind is appropriate, (3) the coowners' interests, (4) whether the art is susceptible to partition, and (5) whether to appoint a receiver for any sale of the art, followed by a second trial to determine the terms of any proposed sale, the property to be sold, the method of sale, and the distribution of proceeds among the coowners. He opines that the first trial would take 18 to 24 months and the second, an additional 12 to 18 months. He states that both decisions would be appealable, that each appeal could take an additional 18 to 24 months, and that it was possible, under Texas law, to suspend the sale of any piece of art subject to litigation during the entire appeal process. Thus, assuming appeals (and, worst case, assuming an appeal of the first decision to the Texas Supreme Court, which could take an additional 6 to 12 months), the entire process before the Texas courts could take anywhere from 6 to 9½ years for each partition action, averaging 7 years in duration. Mr. Miller limits that timeframe to litigation involving "the more expensive Works of Art" (pro rata value in excess of $650,000, which would encompass 9 of the 64 works and 8 of the 62 works of cotenant art), reasoning that "a second appeal would not occur" with respect to the less

valuable works (pro rata value below $650,000) because litigation costs would exceed the values of the works. For those works, he estimates a timeframe of three to four years for each partition action.

Mr. Miller estimates that a buyer of decedent's fractional interest in any of the more expensive works would have $650,000 in total legal and receiver fees in a partition action for a court-ordered sale of the works. For works with a pro rata fair market value between $250,000 and $650,000, Mr. Miller reduces that amount to $250,000. For the rest of the works, he assumes fees equal to the pro rata value of each work "because no 'willing buyer' would expend more in litigation than the value of * * * [the purchased fractional interest]". Mr. Miller notes that there would be additional costs for sales commissions, appraisal fees, and auction house fees. Lastly, Mr. Miller assumes that a receiver would take possession of the art so that there would be additional costs for crating, moving, and storing the art, as well as costs for insurance.

In summary, Mr. Miller assumes that, for a hypothetical buyer instituting a partition action with respect to any one of the more valuable works of art in the Elkins family collection, the total costs for legal fees and other expenditures, could be anywhere from $25,000 to over $1,100,000 (for Jasper Johns' Figure 4) from trial through the appeal process.

*Mark L. Mitchell*

Petitioners' third and final expert witness, Mark L. Mitchell, testified in his capacity as director of valuation services for Clothier & Head, P.S., of Seattle, Washington. He holds a B.S. and an M.B.A. degree from Southern Methodist University and is experienced in providing valuation consulting services in litigation support situations, including tax litigation. He has testified on behalf of the Commissioner and has completed numerous assignments in valuing intangible assets; e.g., patents, trademarks, and trade names. His work has included the valuation of assets where there was no active or regular market, including the valuation of undivided interests in property, but not including (until this assignment on behalf of petitioners) works of art. The Court

accepted Mr. Mitchell as an expert in the valuation of undivided interests in personal property and received the Clothier & Head, P.S. report, prepared by Mr. Mitchell, in evidence as Mr. Mitchell's direct testimony.

Mr. Mitchell states that, in reaching his valuation conclusions, he relied on Mr. Nash's report as the source for the stipulated, undiscounted fair market values of the 64 works of art and for "insight into the potential market for the Undivided Interests", and on Mr. Miller's report regarding partitioning rights and costs related to partition actions including "costs associated with a legal challenge of the Cotenants' Agreement". His final valuation conclusions are based upon those two reports, his analysis of the economics of the art market, and his quantitative methodology.

Mr. Mitchell states that, unlike pure consumption or pure financial assets, art provides both a psychic and financial return to the investor, and, because of that, an art buyer will accept lower financial returns, including less liquidity and certain additional costs (e.g., insurance, maintenance), than will buyers of pure financial assets. He reasons that that is truer of collectors than it is of speculators, who do not seek a psychic benefit and, therefore, normally, will pay less than collectors.

After describing the cotenants' agreement and the nature of an undivided (fractional) interest in a work of art, Mr. Mitchell notes that the limitations that both have on the owner of an undivided interest in any of the 62 works subject to the (amended) cotenants' agreement (e.g., lack of control, limited use of the art as collateral, the need for a lengthy and expensive partitioning process before any sale, a limited market for such interests) justify "substantial" discounts. He also states that "the absence of transaction data involving the fractional ownership of art does not suggest that discounts do not exist for undivided interests in art." Instead, he views the circumstance as "evidence * * * that there are very few willing buyers of such interests, not that there is a limited number of willing sellers."

Mr. Mitchell states that there are two options for the holder of an undivided interest in art (holder) to monetize his holding (absent unanimous consent of all undivided interest holders): option 1, a sale of his undivided interest or, option 2, a successful partition action ultimately leading to a sale of

the work and pro rata distribution of the proceeds among all interest holders.

According to Mr. Mitchell, under option 1, the holder and the hypothetical willing buyer would consider a number of adverse factors in arriving at a price for the holder's undivided interest in any one of the 62 works of art subject to the amended cotenants' agreement, including the need to obtain unanimous consent of all cotenants to sell the work of art, limited possession of the art and, hence, reduced psychic benefit, the cost of transporting the art from another cotenant, joint responsibility for insurance, maintenance or restoration costs with respect to the work of art, and risk of damage to the art by other cotenants, all of which would induce a prospective collector-buyer to demand a substantial return premium (i.e., discount) related to the reduction of both the buyer's psychic and financial returns attributable to fractional ownership. The need for an enhanced return premium would mean a substantial reduction in value from pro rata fair market value. The speculator-buyer's exclusive reliance on marketability (i.e., financial return) means that his financial return premium would be significantly higher than the collector's.

With respect to option 2, Mr. Mitchell concludes that the dollar amount of any discount must exceed anticipated partition litigation costs to make the investment worthwhile. He also notes that, because a partition action will most likely provide a strictly financial outcome (share of proceeds of a court-ordered sale of the art), the buyer will have abandoned any psychic benefit and, therefore, is necessarily a speculator, not a collector.

In valuing decedent's undivided interest in each work of art, Mr. Mitchell assumes, on the basis of the Nash and Miller reports, that the other interest holders have no desire to sell the art so that, under option 1, the hypothetical buyer "faces the prospect of holding a non-marketable interest * * * [indefinitely], with no prospects for * * * [monetizing his interest] and no ability to control decisions regarding the underlying * * * Art", and, under option 2, he is, in effect, purchasing a "litigation claim".

Mr. Mitchell then notes that, because art collectors do not purchase art with the primary intent to profit on a later sale thereof, despite the greater volatility and risk associated

with art as compared with alternative investments (e.g., Government bonds or stock), the financial returns on the former are generally lower than they are on the latter. That apparent anomaly is explained by the psychic benefit that the art collector derives from the art.

On the basis of his analysis of the Nash report, the expected holding period for the art, rates of return data from various art research studies, and anticipated inflation, Mr. Mitchell determines that an option 1 hypothetical buyer of an undivided interest in art would expect a nominal financial return for art in general of 6% and, in this case, need an 8% "consumption return" in order to compensate for diminished psychic benefit. To that 14% incremental return Mr. Mitchell would add "an increment to account for impaired marketability and other risk factors." He concludes that an assumed 10-year holding period "is a reasonable basis on which to assess discounts" and, in general, would require an additional 2% rate of return resulting in a 16% total required rate of return for the hypothetical option 1 buyer (10% "return premium" and 6% financial return), assuming a 10-year holding period for the purchased interest in the art.

Mr. Mitchell modifies the 16% overall rate of return he deems necessary for an option 1 hypothetical buyer's purchase of an interest in art subject to the restrictions the buyer would face in this case in order to account for the varying quality of the works included in the Elkins collection. For that purpose, he adopts Mr. Nash's division of those works into three categories.

Relying on Mr. Nash's opinion of the category I works, Mr. Mitchell differentiates them from his baseline return estimates by reducing his 10% return premium to 8% for works by Jackson Pollock and Henry Moore and increasing it to 12% for works by Sam Francis and Robert Motherwell and 14% for a work by Jasper Johns. He also reduces the required financial return for the Johns work from 6% to 4% because of its fragile condition and the potential ill effects of shared ownership on such a work. Those adjustments result in an overall 14% required rate of return for the Pollock and the Moore and an overall 18% required rate of return for the other three category I works. Using those rates of return, Mr. Mitchell arrives at a 51.7% discount from pro rata fair market value for decedent's interests in the Pollock and the

Moore, a 65.8% discount for decedent's interests in the Francis and the Motherwell, and a 71.7% discount for decedent's interests in the Johns.

Relying on Mr. Nash's description of the category II works, Mr. Mitchell increases the return premium from 10% to 14% and the overall required rate of return from 16% to 20% resulting in a 71.1% discount from pro rata fair market value for decedent's interests in the 19 category II works.

Again, relying on Mr. Nash's description of the remaining (category III) works, Mr. Mitchell increases the return premium to 18% and reduces the financial return to 4% resulting in an overall 22% required rate of return and a 79.7% discount from pro rata fair market value for decedent's interests in those works.

For option 2 buyers, Mr. Mitchell, relying on Mr. Miller's report, factors in the added costs and anticipated duration of partition litigation and posits a 14% required annual rate of return for all category I works (except for the Johns work) and for five of the category II works. For the Johns work, Mr. Mitchell posits an 18% required rate of return, again because of its fragility (which he states "would tend to make the issues * * * with respect to shared ownership [e.g., in-transit damage to the work] more severe") and the high cost of the investment. On the basis of those required rates of return, he computes the option 2 discounts for the art as follows: for decedent's interests in the category I works and five of the category II works, discounts ranging from 60% to 85%; for his interests in the balance of the category II works, a discount of 90% plus, and for his interests in all category III works a 100% discount, presumably on the theory that the costs of litigation would exceed the sale price of all category III works.

Finally, Mr. Mitchell selects the lesser of the option 1 versus option 2 discounts as the appropriate discount for decedent's interest in each work of art.[7] On the basis of those discounts, he determines the discounted fair market value for decedent's interest in each work of art. Mr. Mitchell finds the total discounted fair market value of decedent's interests in the art to be as follows:

---

[7] With respect to all but two of the works of art, the option 1 discount is lower.

| | |
|---|---:|
| Category I ............................................................. | $5,150,420 |
| Category II ........................................................... | 1,904,117 |
| Category III .......................................................... | 604,108 |
| Total ................................................................. | 7,658,645 |

That total, although greater than the $5,462,366 total discounted fair market value computed by Mr. Nash, is much less than the $12,149,650 total discounted value for decedent's interests in the art reported on Schedule F of decedent's estate tax return. It is the difference between that last amount and Mr. Mitchell's discounted total fair market value amount that constitutes the basis for the bulk of petitioners' claim for refund in the petition, the balance being attributable to the increase in the charitable contribution deduction arising by virtue of the refund relating to the estate's alleged overvaluation of the art on its return.

A copy of Mr. Mitchell's table of all 64 works of art, the Nash category of each work, Mr. Mitchell's option 1 and option 2 discounts, his concluded discount for each work, and the resulting discounted fair market value of each is attached to this Opinion as appendix B.

### Respondent's Experts

#### Karen Hanus-McManus

Since 2006, Karen Hanus-McManus has been employed by Jacqueline Silverman & Associates, Inc. (Associates), as an associate appraiser. Before that, she held several positions with the Museum of Contemporary Art, Los Angeles, and, since 2009, she has been an adjunct professor at the New York University School of Continuing & Professional Studies, teaching a course entitled "Essentials of Appraising" for which she developed the course materials. She has a B.A. degree in art history from the University of California, Los Angeles, and two M.A. degrees (in art history and museum studies) from Syracuse University. Since 1977, her employer, Associates, has specialized in the appraisal of modern and contemporary art, preparing thousands of appraisals in numerous contexts including appraisals for estate tax purposes, donations to museums, and legal disputes. Ms. Hanus-McManus has also conducted a study on secondary markets for fractional interests in art. She is the sole author of her

written report in this case, although she conferred with Jacqueline Silverman, president of Associates, who edited, proofread, and cosigned the report. The Court accepted Ms. Hanus-McManus as an expert appraiser of modern and contemporary art and received her written report into evidence as her direct testimony.

Ms. Hanus-McManus testified that the market for modern and contemporary art operates on two levels: the primary market, created by the artist or his or her agent, and the secondary market, controlled by art galleries and dealers and auction houses. On the basis of (1) Associates' more than 30 years' experience observing the primary and secondary markets for modern and contemporary art, (2) conversations with art gallery personnel, dealers, auction houses, banks, and art world professionals, and (3) her survey of 40 art dealers and galleries in New York, Los Angeles and other U.S. cities, Ms. Hanus-McManus concludes that "there is no established marketplace for the sale of a partial interest in a work of art." She notes that there are dealer-to-dealer sales of fractional interests in art in what she refers to as "the wholesale market" but that such a sale would be made in connection with an agreement between the dealers to sell the whole work at a profit and split the proceeds. She further concludes that, while there are sales of fractional interests in art, they involve coowners who intend to sell or donate the entire work of art at a later date and, therefore, are not germane to the hypothetical sale of fractional interests in this case. She admits, however, to having no experience with the buying or selling habits of pure speculators who deal in art without regard to its aesthetic quality.

### John R. Cahill

John R. Cahill is an attorney practicing in New York as a partner in the law firm Lynn & Cahill. More than 80% of his practice is devoted to legal matters concerning clients involved in art including auction houses, museums, artists, art galleries, art collectors and dealers, appraisers, banks, insurance companies, and foundations. He represents clients in both litigation and transactional planning and counsels them on a variety of art-related matters. He also chairs the Art Law Committee of the New York City Bar Association.

The Court accepted Mr. Cahill as an expert in art transactions and received his written report into evidence as his direct testimony.

On the basis of caselaw and his own observations of museum-related and commercial transactions involving joint ownership of art, Mr. Cahill concludes: "In my opinion, the Sale Restriction and related terms in the Cotenant's Agreement, Amendment to Cotenants Agreement and Art Lease are not comparable to similar arrangements entered into by persons in arms length art market transactions."[8]

## OPINION

### I. *Introduction*

We must determine the fair market value of decedent's interest in each of 64 works of art for Federal estate tax purposes. Those interests were included in decedent's gross estate and reported on decedent's estate tax return at a total value of $12,149,650. On the basis of the expert testimony of three experts, and, in particular, Mr. Mitchell's expert testimony, petitioners now argue that that total value must be reduced to $7,658,645. The parties have stipulated that the total, undiscounted fair market value of the art on the valuation date was $35,180,650 ($24,580,650 for the disclaimer art and $10,600,000 for the GRIT art), and respondent bases his proposed deficiency herein on his view that that undiscounted value, to the extent it is allocable pro rata to decedent's interest in each of the 64 works of art (i.e., to the extent of 73.055% of the disclaimer art, or $17,957,393, and 50% of the GRIT art, or $5,300,000, a total of $23,257,393[9]),

[8] Mr. Cahill's conclusion supports respondent's argument that the sale restrictions in the cotenants' agreement and the art lease do not satisfy the requirements of sec. 2703(b)(3). That provision constitutes one of the three requirements of the sec. 2703(b) exception to the application of sec. 2703(a)(2), which generally mandates that "any restriction on the right to sell or use * * * property" be ignored in determining the value of any property for estate and gift tax purposes. *See* discussion *infra*. Petitioners concede that neither the cotenants' agreement nor the art lease satisfies the sec. 2703(b) exception. Therefore, we agree with petitioners that Mr. Cahill's report is not germane to the issues in this case.

[9] On brief, respondent argues that the total stipulated fair market value of decedent's interests in the art on the valuation date is $23,788,504. But, given the parties' stipulated agreement that the value of 100% of the art

constitutes the value of decedent's interests in the art for Federal estate tax purposes.

II. *Burden of Proof*

In general, a taxpayer bears the burden of proof. Rule 142(a)(1). However, section 7491(a) shifts the burden of proof to the Commissioner in certain situations if the taxpayer raises the issue, introduces credible evidence with respect to any factual issue relevant to ascertaining the proper tax liability, and demonstrates compliance with the applicable requirements of section 7491(a)(2).

The parties stipulate that the estate has satisfied the section 7491(a)(2) requirements, and petitioners argue that, through the expert testimony of Messrs. Nash, Miller, and Mitchell and through Ms. Sasser's testimony, they have presented credible evidence of value, thereby shifting the burden of proof to respondent pursuant to section 7491(a).

Because we base our decision regarding the value of decedent's interests in the art upon a preponderance of the evidence, it is not necessary that we assign the burden of proof. *See, e.g.*, *Estate of Black v. Commissioner*, 133 T.C. 340, 359 (2009); *Estate of Bongard v. Commissioner*, 124 T.C. 95, 111 (2005). [10]

---

on that date was $35,180,650 divided between $10,600,000 for the GRIT art and $24,580,650 for the disclaimer art, the undiscounted fair market value of decedent's interests in the art cannot exceed $23,257,393 (50% of $10,600,000, or $5,300,000, plus 73.055% of $24,580,650, or $17,957,393). Therefore, we view respondent's argument for a greater stipulated value for decedent's interests in the art, presumably based upon the agent's valuations on audit, as an inadvertent oversight, and we give it no credence. *See supra* note 3.

[10] Although we agree with respondent that it is unnecessary to assign the burden of proof, we reject respondent's reliance on *Estate of Jelke v. Commissioner*, T.C. Memo. 2005–131 (and cases cited therein), *vacated and remanded on another issue*, 507 F.3d 1317 (11th Cir. 2007), as requiring that result. In those cases, there was deemed to be no need to assign the burden of proof because the operative facts were fully stipulated and supplemented solely by expert witness testimony. Here, there is disputed fact testimony furnished by Ms. Sasser.

III. *Law*

A. *General Principles*

Section 2001(a) imposes a tax on "the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." Section 2031(a) provides: "The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated."

Fair market value is the standard for determining the value of property for Federal estate tax purposes. *United States v. Cartwright*, 411 U.S. 546, 550–551 (1973). Section 20.2031–1(b), Estate Tax Regs., defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." It then states that the fair market value of an item of property is not "to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public" and that, "in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail." The regulation requires that "[a]ll relevant facts and elements of value as of the applicable valuation date shall be considered in every case." The willing buyer and willing seller are hypothetical persons, rather than specific individuals or entities, and their characteristics are not necessarily the same as those of the actual buyer or seller. *See Estate of Newhouse v. Commissioner*, 94 T.C. 193, 218 (1990) (citing *Estate of Bright v. United States*, 658 F.2d 999, 1006 (5th Cir. 1981)). The hypothetical willing buyer and seller are presumed to be dedicated to achieving the maximum economic advantage. *Id.*

B. *Expert Opinions*

In deciding valuation cases, courts often look to the opinions of expert witnesses. Nonetheless, we are not bound by the opinion of any expert witness, and we may accept or

reject expert testimony in the exercise of our sound judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Estate of Newhouse v. Commissioner*, 94 T.C. at 217. Although we may largely accept the opinion of one party's expert over that of the other party's expert, *see Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980), we may be selective in determining what portions of each expert's opinion, if any, to accept, *Parker v. Commissioner*, 86 T.C. 547, 562 (1986). Finally, because valuation necessarily involves an approximation, the figure at which we arrive need not be directly traceable to specific testimony if it is within the range of values that may be properly derived from consideration of all the evidence. *Estate of True v. Commissioner*, T.C. Memo. 2001–167 (citing *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974–285), *aff'd*, 390 F.3d 1210 (10th Cir. 2004).

C. *Section 2703*

As noted *supra* note 8: (1) section 2703(a)(2) provides that, for estate and gift tax purposes, the value of any property is determined without regard to any restriction on the right to sell or use such property, (2) section 2703(b) provides that section 2703(a) does not apply to disregard a right or restriction if it meets certain requirements, and (3) petitioners concede that neither the cotenants' agreement nor the art lease satisfies the section 2703(b) exception. Thus, the section 2703 issue herein is whether the restrictions on transferability in the cotenants' agreement and the art lease are restrictions "on the right to sell or use * * * property" within the meaning of section 2703(a)(2). [11]

_____

[11] Although the notice invokes both sec. 2703(a)(1) and (2) as alternative bases for denying any discount in valuing decedent's fractional interests in the art, and although respondent generally invokes the application of sec. 2703, he emphasizes the application of sec. 2703(a)(2). In fact, because neither the cotenants' agreement nor the art lease provides an option, agreement, or other right to acquire property at a bargain price, sec. 2703(a)(1), by its terms, is inapplicable. Therefore, the only sec. 2703 issue for our decision is whether sec. 2703(a)(2) applies herein.

IV. *Summary of the Parties' Arguments*

A. *Respondent*

1. *Introduction*

Respondent argues that no discount from the pro rata fair market value of decedent's interest in each of the 64 works of art is warranted. Respondent sets forth two grounds for that argument: (1) the restrictions on sale in the cotenants' agreement and the art lease are restrictions that must be disregarded under section 2703(a)(2), and (2) because the proper market in which to determine the fair market value of fractional interests in works of art is the retail market in which the entire work (consisting of all fractional interests) is commonly sold at full fair market value, a fractional interest holder (being entitled to a pro rata share of the sale proceeds) is not entitled to any discount for his or her interest.

2. *Application of Section 2703(a)(2)*

In support of the application of section 2703(a)(2) respondent states:

> In view of the irrefutable evidence that the only way to sell a fractional interest in artwork is by selling the entire art by agreement or through a partition action filed with the court, the only apparent reason for including the restriction on sale language in the Cotenants' Agreement and the Art Lease Agreement * * * was to reduce the value of Decedent's retained fractional interests in the Artwork as part of a plan to make a testamentary transfer of his remaining interests in the Artwork to his children at a reduced transfer tax rate—a purpose which section 2703 was specifically intended to prevent.

Respondent concludes that the restrictions on sale in paragraph 7 of the cotenants' agreement and section 10 of the art lease "are restrictions that are controlled by section 2703" and, accordingly, they must be disregarded in determining the value of decedent's fractional interests in the art.

3. *Use of Undiscounted Pro Rata Fair Market Value in Valuing Decedent's Interests in the Art*

In support of his valuation argument, in which he concludes that no discount is warranted with respect to decedent's interests in the art, respondent states that the

Elkins children's opposition to any sale of the art "is not material" in the light of section 20.2031–1(b), Estate Tax Regs. In so arguing, respondent focuses on that regulation's admonition that "an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market", must be valued at "the price at which the item or a comparable item would be sold at retail." Respondent finds additional support for his view in the testimony of Ms. Hanus-McManus, who concludes that, as of the valuation date, "the sale of an undivided fractional interest in a work of art was not an established practice in the art market, and no service, venue or marketplace exists today for an owner of an undivided fractional interest in a work of art to sell his/her share in that work."

Respondent also cites Mr. Nash's testimony that he could not recall ever advising a client to sell a fractional interest in art at a discount, and that he himself had never done so. Respondent states, however, that "[j]ust because there is no direct market for fractional interests in artwork * * * does not mean that * * * fractional interests in artwork are not bought and sold every day." Respondent concludes that the lack of evidence of discounted sales of fractional interests in art supports his position that "fractional interests in artwork are only sold as part of a sale where the entire interest in the artwork is sold", typically by coowners who know each other and who act in concert when purchasing and selling their respective fractional interests, either by direct sale to a buyer who acquires 100% ownership of the art or, assuming coownership of several works, after a partition in kind or by sale. In either event, the sale results (or, if several works are involved, the sales result) in a fair market value price, and each coowner receives a pro rata share of the proceeds. Thus no fractional interest discounts are warranted.

Respondent does note that, in the case of a particularly valuable item of personal property, "a stranger/speculator could perhaps be found to buy a fractional interest * * * for a deeply discounted price." He argues, however, that "this type of a transaction simply does not occur and even if there have been a few of these unrecorded transactions", they do not reflect the retail market in which we are required to value decedent's fractional interests in the art pursuant to section 20.2031–1(b), Estate Tax Regs.

Although his principal argument is that, as a matter of law, no discount is permissible in valuing undivided fractional interests in art, respondent also argues that, as a factual matter, petitioners' proffered discounts are unsupported by the evidence; i.e., by the testimony of their three experts.

He views Mr. Nash's discounts as having been based on unrealistic scenarios, faulty methodology, and a failure to properly account for the interests of the hypothetical seller by improperly positing the seller's position in the context of a forced sale. Because he views Mr. Nash's proposed discounts as without any justifiable basis, respondent concludes that they are essentially guesses.

He argues that, by referring to "general court statistics" not specific to the timespan for partition actions relating to art and by basing his opinions on a "worst case scenario", Mr. Miller overstated both the time for and costs of a partition action with respect to the art. Respondent further argues that Mr. Miller, because he was instructed to consider partition-related costs in terms of a separate partition action for each work of art, improperly failed to consider the likelihood of and the costs associated with a single action for partitioning the entire collection in kind. On a more fundamental level, respondent rejects the notion of any discount from fair market value based upon anticipated partition costs, arguing that such costs are selling expenses, which, if shown to exist, may constitute deductible administration expenses under section 2053(a).

He criticizes Mr. Mitchell's valuations principally on the ground that Mr. Mitchell considered the hypothetical buyer of decedent's interests in the art to be a speculator, uninterested in obtaining the psychic benefits of owning art, thereby, eliminating "approximately 60 percent of the value of the Artwork that a normal purchaser would pay for the Artwork."

Finally, respondent argues that a determination that a discount is appropriate in valuing decedent's fractional interests in the art would be inconsistent with the Commissioner's longstanding position that fractional interests in art are not discounted for purposes of valuing charitable contributions thereof under section 170. See, for example, Rev. Rul. 58–455, 1958–2 C.B. 100, and Rev. Rul. 57–293, 1957–2 C.B. 153, both of which involve the transfer of either a fractional

interest or a remainder interest in a work of art to a section 170(c) organization, and both of which determine the value of the gift without requiring any discount.

B. *Petitioners*

1. *Application of Section 2703(a)(2)*

Petitioners argue that section 2703(a)(2) does not apply to the cotenants' agreement because paragraph 7 thereof restricts only the sale of any of the 62 works of art covered by that agreement (cotenant art). It does not restrict the sale of a cotenant's or coowner's fractional interest in the work, and it is decedent's fractional interests in the cotenant art, not the art itself, that must be valued for Federal estate tax purposes.

As respondent notes in his opening brief, petitioners do not oppose the application of section 2703(a)(2) to the two works of GRIT art subject to the art lease (leased art); i.e., they do not argue that the restriction on sale provision in section 10 of the art lease gives rise to a discounted value for those two works. Petitioners' failure to so argue is based, presumably, on the fact that that restriction (unlike the restriction in paragraph 7 of the cotenants' agreement) is a restriction on the sale of each party's "percentage interest in" the two works; i.e., it is a restriction, on the right to sell property that must be valued for Federal estate tax purposes. We interpret petitioners' silence in this regard as an admission that, pursuant to section 2703(a)(2), we must value decedent's interests in the leased art without regard to the restriction on sale provision in section 10 of the art lease.

2. *Propriety of Petitioners' Discounts With Respect to the Art*

Petitioners argue that they have fully supported the discounts they seek herein for decedent's interests in the art as they have "provided extensive evidence of facts that would be known to a hypothetical willing buyer and * * * seller with reasonable knowledge of relevant facts, as required by * * * [section 20.2031–1(b), Estate Tax Regs.]". Petitioners reject respondent's assertion that *any* discount would contravene the cited regulation. They argue that "Mr. Mitchell's valuation conclusions fully take into account the risks and

impairments to value" inherent in the hypothetical buyer's alternative options (i.e., option 1: hold the purchased fractional interest for enjoyment, appreciation, and eventual sale of the art; option 2: institute an immediate partition action against the Elkins children), and that "he properly relied on the expert reports of Mr. Nash and Mr. Miller in doing so."

Petitioners argue that caselaw (and, in particular, caselaw arising in the Court of Appeals for the Fifth Circuit, to which an appeal of this case normally would lie) mandates the application of discounts when valuing fractional interests in personal property, including art. Petitioners also argue that, in determining the appropriate valuation discount, the cases take into consideration anticipated costs associated with a partition of the property.

Presumably in defense of Mr. Miller's cost analysis based upon a separate partition action for each work of art, petitioners state that the applicable regulations mandate that decedent's fractional interest in each work be valued separately, citing section 20.2031–1(b), Estate Tax Regs. (value determined with reference to "each unit of property"), and section 20.2031–6(a), Estate Tax Regs. (stating the need to provide a separate valuation for "each article" of household and personal effects). Therefore, petitioners conclude that decedent's fractional interests in the art "cannot be valued * * * as a collection; separate hypothetical buyers and sellers must be posited for each Work." They further state that, because the art does not form "a cohesive collection * * * [with a] unifying theme, there is no factual basis * * * for assuming that a single buyer would be interested in purchasing all of the art."

## V. *Analysis*

### A. *Application of Section 2703(a)(2) to the Cotenant Art*

#### 1. *Introduction*

Should we determine that the restriction on sales of cotenant art in paragraph 7 of the cotenants' agreement constitutes a restriction on the right to sell or use "property" within the meaning of section 2703(a)(2), we must disregard that restriction in valuing decedent's interests in that art.

2. *Analysis*

As noted *supra*, respondent argues that the foregoing restriction on sales of cotenant art constitutes a restriction that must be disregarded under section 2703(a)(2) on the ground that "the only apparent reason for * * * [its inclusion in the cotenants' agreement] was to reduce the value of Decedent's retained fractional interests in the Artwork as part of a plan * * * [to reduce estate taxes]", which respondent characterizes as "a purpose which section 2703 was specifically intended to prevent."

The evidence with respect to intent is inconclusive. The cotenants' agreement was entered into in February 2000, six years before decedent's death in February 2006, and paragraph 7 may have been intended only to keep the art in the family unless there was a work that no one wished to retain. Of greater significance, however, is the fact that section 2703(a)(2) does not refer to intent as a controlling or even relevant factor. The only question is whether the property to be valued, for estate or gift tax purposes, is subject to a restriction on sale or use.

Petitioners argue that, because paragraph 7 of the cotenants' agreement does not restrict the sale of decedent's fractional interests in the cotenant art (the property to be valued for estate tax purposes), section 2703(a)(2) is inapplicable. In connection with that argument, petitioners point to the definitional reference to the term "property" in the cotenants' agreement, which, in pertinent part, states that "[e]ach cotenant is the owner of an undivided interest in each item of property described in Exhibit A [listing the works of art] * * * (hereinafter, all of such property or any part thereof shall be referred to as the 'Property')". Petitioners argue that, although "property" under the foregoing definition "could refer to one, several, or all of the 62 Works in their entirety, under no interpretation does * * * [it] refer to a fractional interest in the Works." Respondent disagrees. He reads the foregoing language, and, in particular, the reference to "any part" of the property as a reference to the cotenants' undivided fractional interests in the cotenant art.

We think that both petitioners' and respondent's analyses miss the mark. During trial, we queried Mr. Miller, petitioners' expert on partition, about paragraph 7 of the coten-

ants' agreement. We pointed out to him that, for a sale of any of the jointly owned properties (i.e., works of art) to occur, *all* of the cotenants would have to agree, and that would be so independent of the language of paragraph 7 of the cotenants' agreement. He agreed. We added: "So that the statement that an item of property may only be sold with the unanimous consent of all of the cotenants is a rather unremarkable statement of the obvious." He responded: "I do agree." With respect to what the language of paragraph 7 accomplished, he testified: "If this language was not in the co-tenancy agreement, any individual interest owner would have the right to commence a partition action." That is in accord with his direct, written testimony, wherein he states that the right to partition is absolute, although cotenants may expressly or impliedly agree not to partition, and that he has "assumed that Provision 7 * * * is, in essence, an agreement by the Co-Owners not to partition." With exceptions not here relevant, section 2703(a)(2) instructs that "the value of any property shall be determined without regard to * * * any restriction on the right to sell or use such property." Whether paragraph 7 of the cotenants' agreement is a restriction on decedent's right to sell the cotenant art or is a restriction on his right to use the cotenant art is not important. It is clear that, pursuant to paragraph 7 of the cotenants' agreement, decedent, in effect, waived his right to institute a partition action, and, in so doing, he relinquished an important use of his fractional interests in the cotenant art. While, as we shall explain, it makes little or no difference to our conclusion as to the value of the art, we shall, in determining the value of each of the items of cotenant art, disregard any restriction on decedent's right to partition.

### 3. *Conclusion*

We hold that section 2703(a)(2) is applicable to the restriction, in paragraph 7 of the cotenants' agreement, on sales of cotenant art.

B. *Whether and the Extent to Which the Estate Is Entitled To Discount Decedent's Interests in the Art*

1. *Introduction*

Our determination that section 2703(a)(2) negates the restriction on sales of cotenant art in paragraph 7 of the cotenants' agreement, coupled with petitioners' concession that section 2703(a)(2) negates the restriction on sales of the lessor's and lessee's interests in the leased art contained in section 10 of the art lease, leaves the hypothetical willing seller and buyer in the same negotiating position with respect to decedent's interests in all 64 works of art. That is because, as a result of those section 2703(a)(2) determinations, neither the cotenants' agreement nor the art lease may be read as restricting the hypothetical seller's right to sell decedent's interests in the subject art, but the hypothetical buyer's ability to monetize those interests on an undiscounted basis remains subject either to the coowners' (i.e., the Elkins children's) agreement to a sale of the underlying art and a pro rata splitting of the proceeds of sale or to the need to institute a partition action in order to achieve that result. [12]

In resolving the parties' dispute over the proper valuation of decedent's interests in the art, we first address the question of whether any discount from pro rata fair market value is permissible under section 20.2031–1(b), Estate Tax Regs., and, if the answer to that question is yes, we must then determine the proper amount, if any, of that discount.

2. *Whether Any Discount Is Permissible*

a. *Analysis*

Respondent's argument that no discount is warranted in valuing decedent's fractional interests in the art is premised

[12] The parties have not addressed whether the hypothetical seller would constitute a "successor" to decedent's interests in the disclaimer art and the leased art pursuant to sec. 8 of the cotenants' agreement and sec. 13 of the art lease. Nor have they addressed how the hypothetical seller's status as such might affect the value of his or her interests in the art. We do not consider that to be a significant valuation issue, however, because, whether or not the hypothetical seller constitutes a "successor" to decedent's interests under either agreement, no sale of the underlying art can occur without either the consent of the Elkins children, which, presumably, would not be forthcoming, or a successful partition action.

essentially on his view that, (1) under section 20.2031–1(b), Estate Tax Regs., the fair market value of tangible personal property must be determined with reference to the market in which the property is most commonly sold to the public and, (2) in the case of art, that market is the retail market whereby all fractional interest holders agree to sell (or sell after a partition action) the underlying art, i.e., where the art is sold for its undiscounted fair market value, after which each fractional interest holder receives his or her pro rata share of the proceeds.

In support of his position, respondent cites *Estate of Scull v. Commissioner*, T.C. Memo. 1994–211, and *Stone v. United States*, 99 A.F.T.R.2d (RIA) 2007–2992 (N.D. Cal. 2007), *supplemented by* 100 A.F.T.R.2d (RIA) 2007–5512 (N.D. Cal. 2007), *aff'd*, *Stone ex rel. Stone Trust Agreement v. United States*, 103 A.F.T.R.2d (RIA) 2009–1379 (9th Cir. 2009).

In *Stone*, the District Court rejected the plaintiffs' proffered 44% fractional interest discount for the decedent's 50% interest in 19 paintings on the ground that a hypothetical seller would seek to sell each entire work of art (with the co-owners' consent or via partition) and take his or her pro rata share of the proceeds or sell the partial interest at a price equivalent thereto. On that basis, the District Court concluded that, "because an undivided interest holder has the right to partition, a hypothetical seller under no compulsion to sell would not accept any less for his or her undivided interest than could be obtained by splitting proceeds in this manner." *Stone*, 99 A.F.T.R.2d (RIA) at 2007–2996. The District Court did, however, decide that "some discount is appropriate to allow for the uncertainties involved in waiting to sell the collection until after a hypothetical partition action is resolved". *Id.* at 2007–2998 (citing *Estate of Scull v. Commissioner*, T.C. Memo. 1994–211). In its supplemental opinion, the District Court determined that the "relatively low" 5% discount proposed by the Government was appropriate in the absence of proof by the plaintiffs that they were entitled to more than a 2% discount to account for selling costs plus a $50,000 discount to account for the hypothetical seller's legal fees in connection with any partition action. Moreover, the District Court was not persuaded that a hypothetical buyer would refuse to buy the decedent's interest in

the collection unless the discount were greater than 5%. *Stone*, 100 A.F.T.R.2d (RIA) at 2007–5514.

In *Estate of Scull*, the decedent died owning a 65% undivided interest in a "pop" and minimalist art collection that he and his wife had accumulated before their divorce. In connection with divorce-related litigation in the New York State courts, there was a court-ordered in-kind division of the collection (65% to the decedent, 35% to Mrs. Scull) that did not go into effect before the decedent's death. Thirty days after the decedent's death, Mrs. Scull appealed that decision, seeking a 50% share of the collection. Just before his death, the decedent had also appealed an earlier New York State appellate court decision sustaining the imposition of constructive trusts on the collection for Mrs. Scull's benefit.

The estate argued that the value of the decedent's 65% interest in the collection was less than 65% of the entire collection. We noted that "[a]ny purchaser of * * * [the estate's] interest in the collection as of * * * [the date of the decedent's death] would consider * * * [Mrs.] Scull's rights in the collection and * * * [the decedent's] pending appeal on the date of death." We then stated as follows:

> However, since * * * [the decedent's] appeal, if successful, would have increased his share, that appeal does not provide any basis for a reduction. Moreover, since * * * [Mrs.] Scull's appeal came later, it probably should not be taken into account. In any event, given the trial court's detailed explanation of its basis for its determination of the 65–35 split, we think that a purchaser would not require a reduction in excess of 5 percent for any uncertainties involved in acquiring decedent's 65-percent interest, despite one or both appeals. * * *

Thus, on the facts of that case, we allowed a 5% valuation discount from pro rata fair market value.

We fail to see how either *Stone* or *Estate of Scull* supports respondent's position. In both cases, the court approved a discount from pro rata fair market value for the decedent's fractional interest in an art collection in order to account for various uncertainties that would confront a hypothetical buyer of the art. Although the 5% discount approved in each case was essentially nominal, that was because of a lack of proof that any greater discount was warranted, not because of any regulatory prohibition against discounts for art that is normally sold at retail. Moreover, the District Court in *Stone* agreed with the plaintiffs that, "contrary to the government's

assertions, the costs of a court-ordered partition must be considered in determining the fair market value of the Estate's interest in the collection." *Stone*, 99 A.F.T.R.2d (RIA) at 2007–2997. That position was based, primarily, on the District Court's view that it could not "assume that the Estate's co-owner in the [art] collection [the estate's trustees actually owned the entire collection] would agree either to a sale of the collection as a whole or to a division of the nineteen paintings among the co-owners." *Id.* at 2007–2997 through 2007–2998. The District Court's refusal to personalize the circumstances surrounding a hypothetical sale was based upon the admonition of the Court of Appeals for the Ninth Circuit in *Propstra v. United States*, 680 F.2d 1248, 1251–1252 (9th Cir. 1982), that the willing seller must be "a hypothetical seller rather than the estate or any of decedent's beneficiaries" and that defining fair market value in terms of that "objective standard" will serve to avoid

> the uncertainties that would otherwise be inherent if valuation methods attempted to account for the likelihood that estates, legatees, or heirs would sell their interests together with others who hold undivided interests in the property. Executors will not have to make delicate inquiries into the feelings, attitudes, and anticipated behavior of those holding undivided interests in the property in question. * * *

*Accord Estate of Bonner v. United States*, 84 F.3d 196, 198 (5th Cir. 1996); *Estate of Bright v. United States*, 658 F.2d at 1006;[13] *see also Holman v. Commissioner*, 601 F.3d 763, 775 (8th Cir. 2010), *aff'g* 130 T.C. 170 (2008).

In this case, not only, as stated by the District Court in *Stone*, 99 A.F.T.R.2d (RIA) at 2007–2998, are we not entitled to assume that the Elkins children "would agree either to a sale of * * * [the art] or to a division * * * [thereof] among

---

[13] *Propstra v. United States*, 680 F.2d 1248 (9th Cir. 1982), and *Estate of Bright v. United States*, 658 F.2d 999 (5th Cir. 1981), both constitute a rejection of the "family attribution" or "unity of ownership" principle, which takes into account the close relationship among the decedent, executor, or legatee, on the one hand, and the other coowners of real or personal property, on the other hand, in valuing the decedent's minority interest in the property. The Government's argument, rejected by the Court of Appeals for the Ninth Circuit in *Propstra*, was that, in the absence of a showing that such parties, if related, were likely to sell their interests separately, "one can reasonably assume" that those interests, including the decedent's interest, will be sold as a unit. *Propstra*, 680 F.2d at 1251–1252.

the co-owners", but, unlike the circumstances in *Propstra* and *Estate of Bright*, we are presented with unchallenged facts demonstrating that the Elkins children had strong sentimental and emotional ties to each of the 64 works of art so that they treated the art as "part of the family". Those facts strongly suggest that a hypothetical buyer of decedent's fractional interests in the art would be confronted by coowners who were resistant to any sale of the art, in whole or in part, to a new owner, a resistance that the Elkins children specifically communicated to Mr. Nash. In this case, it is not necessary for the executors to speculate or "make delicate inquiries into the feelings, attitudes and anticipated behavior" of the other owners. It is clear that they have a deep and abiding love for the art and, therefore, could be expected to be hostile to a joint sale of any one or all of the 64 works to a new owner, a hostility that they explicitly expressed to Mr. Nash during their meeting with him preparatory to his inspection of the art. That being so, the hypothetical seller and buyer necessarily would be faced with uncertainties regarding the latter's ability to monetize his or her investment in the art. As in *Stone*, "some discount is appropriate to allow for * * * uncertainties". *Stone*, 99 A.F.T.R.2d (RIA) at 2007–2998.

We also reject respondent's argument that consideration of the Elkins children's probable hostility to any sale of the art to a new owner violates the requirement to consider the hypothetical, not the actual, seller. The Elkins children, as coowners of the art, would not be the sellers of decedent's interests therein and cannot be viewed as such. Their hostility would be to any sale to a new owner of one or more of the works in which they, like the hypothetical seller, owned a fractional interest. That probable hostility constitutes one of the "relevant facts and elements of value as of the * * * valuation date [that] shall be considered [by the hypothetical seller and buyer] in every case", as mandated by section 20.2031–1(b), Estate Tax Regs.

As noted *supra*, respondent's no-discount argument is premised upon the requirement in section 20.2031–1(b), Estate Tax Regs., that the value of "an item of property * * * generally obtained by the public in the retail market * * * is the price at which the item or a comparable item would be sold at retail." Respondent describes the market for fractional

interests in art (as well as for other types of personal property) as one in which the holder of the fractional interest either purchases or inherits the interest under circumstances in which the holder and the other coowners (who may be family members, friends, or, in the case of art, art dealers) hold, or simultaneously acquire, their interests with a shared goal of selling (or, if the fractional interests are purchased, of reselling) the entire item of property at retail, either directly or after a partition of the property. Respondent posits that, under any of those scenarios, the interest holders would each receive a pro rata share of the property or of the proceeds from the sale thereof, and no fractional discounts would be applied. Focusing specifically on the facts of this case, respondent argues that it would be in the financial interests of both the Elkins children and the hypothetical buyer to agree to (1) sell the art and divide the proceeds pro rata, (2) divide the art pro rata, or (3) some combination of those two alternatives, none of which would entail a fractional interest discount. Respondent cites *Holman v. Commissioner*, 601 F.3d at 775, and its affirmation of caselaw describing the hypothetical buyer and seller as rational economic actors lacking "motivations that are personal and reflective of the idiosyncracies of particular individuals."

Although respondent's approach to the valuation of personal property would have merit in the absence of "relevant facts" that would render that approach unrealistic and, therefore, inapplicable, here such facts exist in the form of the Elkins children's probable resistance to any sale or partition of the art that would result in new ownership; and although, by opposing such a sale, the Elkins children might not be acting in their best economic interests, [14] they undoubtedly would view continued retention of the entire collection as acting (to paraphrase Mr. Mitchell) in their best psychic interests; i.e., they would be willing to forgo the financial gain from a sale of the art in order to keep the collection intact and continue to enjoy it.

---

[14] It is, of course, possible that, by holding on to the art, subsequent appreciation of one or more works would allow the fractional interest holders to realize a greater economic benefit than would have resulted from an immediate sale of the art at its fair market value on the valuation date.

We do not interpret section 20.2031–1(b), Estate Tax Regs., as mandating reference to the retail market for entire works of art in determining the fair market value of decedent's fractional interests in the art. As both Mr. Nash (implicitly) and Ms. Hanus-McManus (explicitly) agree, there is no market (retail or otherwise) in which undivided fractional interests in art are "commonly sold to the public". Secondly, the prospect of a fair market value sale of the art followed by a pro rata division of the proceeds among the coowners is manifestly uncertain in this case. The fact that there exists a retail market for works of art with multiple owners does not necessarily mean that all fractional interests in art must be valued as if it is certain that the art will be sold in that market. The regulation should not be read in a vacuum, without reference to actual circumstances. *See, e.g.*, *Estate of Baird v. Commissioner*, T.C. Memo. 2001–258 (agreeing to "an increased discount" in valuing the decedent's interest in jointly owned timberland because of the uncertainty of whether the family-member coowners would force a hypothetical willing buyer to institute a partition action with respect to the property); *Estate of Lauder v. Commissioner*, T.C. Memo. 1994–527 (approving a 40% discount for lack of liquidity with respect to the decedent's interest in a family-owned corporation on the basis of a finding that the coshareholder family members intended to maintain the company "as a privately held, family-controlled company" thereby rendering the sale of the decedent's shares on a public market "remote").

Moreover, respondent's approach ignores the willingness of the courts in *Stone* and *Estate of Scull* to permit discounts for fractional interests in art, provided there is adequate proof of entitlement thereto. Respondent also ignores precedent in the Court of Appeals for the Fifth Circuit permitting valuation discounts for fractional interests in property. *E.g.*, *Estate of Bonner*, 84 F.3d 196; *Estate of Bright*, 658 F.2d 999.

We also reject respondent's argument that partition costs may be deductible as administration expenses under section 2053(a)(2) but may not be cited as justification for a valuation discount. To begin with, respondent's position is directly contrary to the caselaw permitting discounts in the light of uncertainties regarding the possibility of and/or costs associated with partition actions. *E.g.*, *Estate of Bonner*, 84

F.3d at 197–198; *Estate of Baird v. Commissioner*, T.C. Memo. 2001–258; *Stone*, 99 A.F.T.R.2d at 2007–2997, 2007–2999; *accord Estate of Baird v. Commissioner*, 416 F.3d 442, 452–453 (5th Cir. 2005) (citing *Estate of Bonner*, 84 F.3d at 197–198), *rev'g* T.C. Memo. 2002–299. Secondly, the anticipated expense of a partition action is not an anticipated expense of the estate's sale of property to be valued. Rather, as petitioners note, it is an expense that the hypothetical buyer might have to incur after purchasing that property. As we have held, such costs are costs that a potential buyer would have to "take into account in determining the price he would be willing to pay. This, of course, is consistent with the definition of fair market value. See sec. 20.2031–1(b), Estate Tax Regs." *Estate of Smith v. Commissioner*, T.C. Memo. 1993–236. Lastly, the cases upon which respondent relies are inapposite. The court in each of those cases rejected taxpayer claims that the fair market value of property was the net amount received by the seller after payment of excise taxes, sales commissions, or other expenses of sale and held the fair market value to be the gross amount paid by the buyer to the seller. *See Estate of Smith v. Commissioner*, 57 T.C. 650, 659 (1972), *aff'd*, 510 F.2d 479 (2d Cir. 1975); *Estate of Gould v. Commissioner*, 14 T.C. 414, 417 (1950); *Payne v. United States*, 35 A.F.T.R.2d 75–1623 (M.D. Fla. 1975). The costs involved in each of those cases were the seller's costs associated with the sale whereas here, as we have noted, the anticipated partition costs are anticipated costs of the buyer, which are properly considered in determining fair market value. *See Estate of Smith v. Commissioner*, T.C. Memo. 1993–236.

Lastly, we reject respondent's argument that the Commissioner's rulings policy (reflected in both revenue rulings and private letter rulings), whereby undiscounted pro rata fair market value deductions are allowed for charitable contributions of fractional interests in art, controls the valuation of decedent's fractional interests in the art.

Respondent cites two revenue rulings in which the taxpayer donated to a section 170(c) organization either all or a portion of the taxpayer's remainder interest in the art with the taxpayer retaining sole right of possession for life, or an undivided fractional interest in the art resulting in shared possession. Those rulings state that the donor is entitled to

a deduction for either the present value of the remainder interest or for the undiscounted pro rata fair market value of the undivided fractional interest transferred. *See* Rev. Rul. 58–455, *supra*; Rev. Rul. 57–293, *supra*. Respondent argues that any discount in valuing fractional interests in art for estate tax purposes would conflict impermissibly with the position taken in the rulings.

We are not bound by revenue rulings, and the weight (if any) that we afford them depends upon their persuasiveness and the consistency of the Commissioner's position over time. *Taproot Admin. Servs., Inc. v. Commissioner*, 133 T.C. 202 (2009), *aff'd*, 679 F.3d 1109 (9th Cir. 2012). In the earlier ruling, the Commissioner does not provide a rationale for his failure to discount (other than to present value) the value of the charitable contributions of the remainder or fractional interests in the art, and the later ruling cites only the prior ruling as authority. In neither ruling is there any indication of an impediment to a joint, fair market value sale of the art or, if such an impediment does exist, that the Commissioner took it into account. Moreover, in the light of precedent in both this Court and the Court of Appeals for the Fifth Circuit allowing discounts in valuing a fractional interest in property for Federal estate tax purposes where there are potential impediments to a fair market value sale of the interest (e.g., the possible need for a partition action), the rulings do not persuade us to deny any discount for decedent's fractional interests in the art. [15]

---

[15] Petitioners distinguish the Commissioner's ruling position on the ground that it deals with income rather than estate taxes (a position that finds support in *Stone v. United States*, 99 A.F.T.R.2d (RIA) 2007–2992, 2007–2997 n.9 (N.D. Cal. 2007), *supplemented by* 100 A.F.T.R.2d (RIA) 2007–5512 (N.D. Cal. 2007), *aff'd*, *Stone ex rel. Stone Trust Agreement v. United States*, 103 A.F.T.R.2d (RIA) 2009–1379 (9th Cir. 2009)) and on the further ground that it should be interpreted as applying only to the "common situation" in which the donor "makes a series of fractional donations and ultimately donates the entire work of art in full." Neither effort to distinguish the Commissioner's rulings from the facts of this case is persuasive. There is no basis for concluding that the term "value" has a meaning for income tax purposes different from the one it has for estate tax purposes, i.e., fair market value is fair market value (see sec. 1.170A–1(c)(1), Income Tax Regs., which provides a definition of fair market value identical to that provided by sec. 20.2031–1(b), Estate Tax Regs.); and we fail

Continued

Respondent also cites two cases decided by this Court in which we permitted undiscounted fair market value deductions for charitable contributions of, in one case, undivided fractional interests in an art collection and, in the other case, a collection of "antique stereoscopic" equipment and related material. *See Winokur v. Commissioner*, 90 T.C. 733 (1988); *Mast v. Commissioner*, T.C. Memo. 1989–119. In both cases, the sole valuation issue was the undiscounted fair market value of the collection, there being no dispute over the possible application of a pro rata deduction for the donated fractional interest. The parties did not raise the issue of a fractional interest discount, and we did not consider it. Therefore, we do not view those cases as precedent for denying a valuation discount in this case.

b. *Conclusion*

There is no bar, as a matter of law, to an appropriate discount from pro rata fair market value in valuing, for estate tax purposes, decedent's undivided fractional interests in the art.

3. *The Extent to Which Petitioners Are Entitled To Discount the Pro Rata Fair Market Value of Decedent's Interests in the Art*

a. *Introduction*

Only petitioners' valuation experts, Mr. Nash and Mr. Mitchell (both of whom based their reports, in part, on Mr. Miller's expert testimony), analyze the extent to which a discount from pro rata fair market value for decedent's undivided fractional interests in the art is warranted. Ms. Hanus-McManus essentially opines that there is no market for an undivided interest in art other than in connection with an agreement or understanding among the coowners that they

---

to see the basis for petitioners' assumption that respondent's allowance of an undiscounted fair market value deduction for the contribution of an undivided fractional interest in art (in Rev. Rul. 57–293, 1957–2 C.B. 153, 154–155, Ex. 2) is best read to apply to a situation in which the contribution was one in a series of contributions ultimately providing the donee with complete ownership and possession of the art. Thus, although we decline to apply the rulings to the facts of this case, we do so on grounds other than those proffered by petitioners.

will agree to a joint sale of the art at some future time.[16] Respondent offers her testimony solely in support of his argument that no discount is warranted in valuing an undivided fractional interest in art. As noted *supra*, Mr. Cahill also does not address the subject of discounts, opining only that the restrictions on sales of cotenant art "are not comparable to similar arrangements entered into by persons in arms length art market transactions." Respondent offers that report solely in support of his application of section 2703 to the cotenant art.

b. *Analysis*

Having decided that petitioners may introduce facts demonstrating the estate's entitlement to a discount from pro rata fair market value for the art, the issue before us is whether and to what extent we should sustain the discounts proffered by Mr. Mitchell on the basis of the expert testimony of Messrs. Nash and Miller.

The overriding flaw in Mr. Nash's and (derivatively) Mr. Mitchell's analyses is their failure to consider not only the Elkins children's opposition to selling any of the art but also their ownership position vis-a-vis that of the hypothetical willing buyer and the impact that the 73.055–26.945 or 50–50 ownership split would have on the negotiations between seller and buyer. Both experts should have considered the fact that the Elkins children, cumulatively, were entitled to possession of 61 works of cotenant art for a little over three months each year, and to possession of the three works of GRIT art for six months of each year.[17] The relatively brief

---

[16] Mr. Nash is in apparent agreement with that conclusion, but he nonetheless opines that a collector or speculator might offer to purchase decedent's interests in the art at an appropriate discount, i.e., "at a price that was deeply discounted from the actual market value to justify the risks involved."

[17] The Elkins children were before, and have been since, decedent's death content to leave all but the smaller works of art (which they have rotated among themselves) in place in the Houston area (primarily in Mr. and Mrs. Elkins' family home) where each has ready access to all of the art. Thus, despite their separate, individual rights of exclusive possession, we assume for purposes of this analysis that possession by any one child may be treated as possession by all three. Therefore, we consider their rights of possession as a cumulative or combined right of possession, i.e.,

Continued

period of annual possession and the expense and inconvenience of annually moving the art from the hypothetical buyer's premises back to Houston most likely would have caused the Elkins children to reassess their professed desire to cling, at all costs, to the ownership status quo existing after decedent's death. Thus, the hypothetical buyer would be in an excellent position to persuade the Elkins children, who, together, had the financial wherewithal to do so, to buy the buyer's interest in any or all of the works, thereby enabling them to continue to maintain absolute ownership and possession of the art.[18] Neither Mr. Nash nor Mr. Mitchell considered that possibility.

Ms. Sasser testified that, in the light of a relatively short period of possession of the art to which she and her siblings would be entitled vis-a-vis a hypothetical buyer, and considering that the buyer would, most likely, not reside in the Houston area, she "would be willing to pay * * * a fair price" to purchase the hypothetical buyer's 73.055% or 50% interests in the art. Her testimony confirms what both the hypothetical willing buyer and seller would reasonably suspect during their negotiations: that the Elkins children's strong desire to retain possession of the art in place would motivate them to purchase the hypothetical buyer's interests, most likely in each case for an amount equal or close to the undiscounted fair market value of the interest. It defies logic to assume that, as 27% or 50% owners and possessors of the art, the Elkins children would spend millions of dollars to retain their status as such, perhaps as defendants in multiple partition actions that could drag on for many years, when they would be able to acquire 100% ownership and

---

26.945% (3 × 8.98167%) of each year for 61 works and 50% (3 × 16.667%) of each year for three works.

[18] During her testimony, Ms. Sasser suggested that, as a means of reducing the number of moves to which the art would be subject under the co-tenants' agreement, she might opt to revise the agreement so that the art would be moved only once every three years, i.e., she and her siblings could retain 61 works for some 9 months and 3 works for 18 months every three years. But even if we assume that a hypothetical buyer would agree to such an arrangement, the perennial back-and-forth movement of the art would remain an expensive and undesirable option for the Elkins children.

possession of the art, which, after all, is what they really want. [19]

Petitioners argue that the "fair price" referred to by Ms. Sasser would not exceed "fair market value", meaning the discounted values determined by Messrs. Nash and Mitchell. We disagree. Ms. Sasser's testimony confirms that the Elkins children would be willing to purchase the hypothetical buyer's interests in the art at much higher prices than a disinterested buyer would be willing to pay for the same interests because of the children's added motivation of keeping the art within the family as, in petitioners' words, "a memorial to their parents rather than [as] an investment". That motivation is reflected in the following exchange:

Q: All right. So, most of the attachment to the art is as a memorial to your parents, and it means more to you than money in this instance?

A: Yes, it does.

Ms. Sasser further testified that by a "fair price" she meant the price determined by "an expert or somebody who knew something about it". Then, during a subsequent colloquy between Ms. Sasser and the Court, Ms. Sasser shed further light on what she considered to be a "fair price":

THE COURT: Now, I want you to explain to me why you would be reluctant to sell * * * [the art], to sell your piece?

THE WITNESS: I guess honestly that I would be hoping that some day that I could buy, or * * * [maybe] we could buy, me, my brother, and sister, could buy the 73[%] back in some way.

THE COURT: Well, would you be willing to pay a pro rata portion, * * * [73] percent, of the fair market value of the whole piece of art, of each of the ones that you liked, to get back that * * * [73] percent interest that somebody else had?

---

[19] As discussed *infra*, the Elkins children most likely would be willing to pay a hypothetical buyer substantially more than the anticipated attorney's fees and related costs they would incur to oppose the buyer's partition action simply because the outcome of a purchase by them would be so much more satisfactory. Moreover, because of their desire to preserve intact and continue to have uninterrupted access to the entire collection, it is reasonable to assume that the Elkins children would be as motivated to purchase the hypothetical buyer's interests in Mr. Nash's category III works as they would be to purchase the buyer's interests in Mr. Nash's category I and category II works. Indeed, Mr. Nash testified that he had met with the Elkins children, who are "committed to retaining the art in the family until the last * * * [of them] dies."

THE WITNESS: I would be willing to pay if somebody told me that it was a fair price to get that, and I can't say what is fair.

Later, in reference to a particular painting (Pool on Sprayed Blue Paper by David Hockney), the following exchange took place:

THE COURT: The Pool? Okay. They say that the sales value of it is $900 thousand. Would you then be willing to pay * * * [73] percent of that to get it back, assuming that you were convinced that was a fair price?

THE WITNESS: If somebody who knew the art market assured me that was a fair price, then yes, I would.

We infer from the foregoing exchange that the "fair price" Ms. Sasser was willing to pay was decedent's pro rata share of an expert-verified undiscounted fair market value of the art, as exemplified by her willingness to pay 73% of the $900,000 stipulated fair market value of the Hockney painting were that still a "fair price". At the time she testified, Ms. Sasser obviously was aware of the sharply discounted values posited by Messrs. Nash and Mitchell for decedent's interests in the art and of the fact that those values were based upon the hypothetical buyer's having to confront the Elkins children's unrelenting opposition to any attempt by the buyer to employ a partition action to monetize his or her investment in the art or to obtain full possession of a pro rata portion thereof, circumstances that she knew were irrelevant to her (and her siblings') potential purchase of decedent's interests, which would give them 100% ownership of the art. Had she had those sharply discounted values in mind when responding to the Court's questioning, she would not have left open the possibility that 73% of the $900,000 undiscounted fair market value of the Hockney painting might constitute a "fair price" for decedent's interest therein. Moreover, the hypothetical willing buyer and seller would suspect the Elkins children's willingness to pay pro rata fair market value, or something close to it, and they would price decedent's interests in the art accordingly. Therefore, we reject petitioners' conclusion that a hypothetical owner of decedent's fractional interests in the art, cognizant of the Elkins children's "staying power", i.e., their determination "to outlast any third party who attempted to force a sale of a Fractional Interest by litigation", would have

to sell the art to the Elkins children at the sharply discounted values determined by Messrs. Nash and Mitchell "because he or she could not expect to 'out-negotiate' the Elkins Children and because no one else would offer any more than * * * [those discounted] values." We fail to see the connection between the Elkins children's so-called staying power and the fair market value of decedent's interests in the art in the context of the children's purchase of those interests. Ms. Sasser testified that she would opt to preserve her minority interests in the art, rather than monetize those interests, but only on the assumption that she could not "buy it back". Clearly, then, her preference (and, presumably, that of her siblings) was to repurchase decedent's fractional interests in the art from the hypothetical buyers, and we see no evidence that she or they would limit their offer to an amount not in excess of the discounted values posited by Messrs. Nash and Mitchell.

The actual bargaining position that a hypothetical buyer of decedent's interests in the art would have vis-a-vis the interests of the Elkins children constitutes one of the "relevant facts" that we must deem to be considered by a hypothetical buyer and seller pursuant to section 20.2031–1(b), Estate Tax Regs. See *Estate of Winkler v. Commissioner*, T.C. Memo. 1989–231, where, in valuing a 10% block of voting stock in a closely held corporation, we took into account the fact that the hypothetical buyer thereof would represent the "swing vote" between the two families that owned the other 90% (50% and 40%) of the voting stock. On that basis, we held that a buyer, unrelated to either family, "would be willing to pay a premium for a 10 percent block of voting stock that could be pivotal as between the two families" and that "a minority discount would be inappropriate here." *See also Estate of Andrews v. Commissioner*, 79 T.C. 938, 956 (1982) ("Certainly, the hypothetical sale should not be constructed in a vacuum isolated from the actual facts that affect the value of the stock in the hands of the decedent[.]"); *True v. United States*, 547 F. Supp. 201, 203 (D. Wyo. 1982) ("Hypothetical analysis can be a valuable tool; however, when real considerations exist, those realities should not and cannot be ignored.").

The logic of assuming that the Elkins children would pay a hypothetical buyer of decedent's interests in the art more

than a disinterested collector or speculator would have paid for those interests is also confirmed by cases recognizing that certain properties possess an enhanced "assemblage" value. *See, e.g.*, *Pittsburgh Terminal Corp. v. Commissioner*, 60 T.C. 80, 90 (1973) (dicta: "[W]e do not quarrel with * * * [the taxpayer's] assertion that aggregation increases the value of coal lands[.]"), *aff'd without published opinion*, 500 F.2d 1400 (3d Cir. 1974); *Serdar v. Commissioner*, T.C. Memo. 1986–504. [20] In *Serdar*, the taxpayer gave two parcels of real property to Smith in exchange for a single parcel valued at more than what the Commissioner considered to be the combined value of the taxpayer's two properties. The Commissioner determined that the difference constituted ordinary income to the taxpayer attributable to a prepayment penalty, owed by Smith to the taxpayer, related to a prior transaction. In rejecting the Commissioner's argument, we reasoned as follows:

> We think that * * * [the Commissioner's] appraisal failed to adequately take into account factors that made the properties peculiarly adaptable to Smith's use, and that their fair market value equaled the value of the consideration received for them. The factors that the appraisal failed to adequately take into account are the value to Smith of the road and railroad access that the properties provided and their assemblage value, and, with respect to the Wadsworth Property, the value to Smith of eliminating a tract of land that would have jutted north into his assemblage.
>
> *     *     *     *     *     *     *
>
> In sum, we believe that Smith was convinced that it was essential to acquire * * * [the two properties] to enable him to develop his property as he planned, that he was therefore willing to pay a high price for those properties, and that * * * [the taxpayer] knew of Smith's plans and drove a hard bargain.

In this case, the hypothetical willing buyer (whether he be a collector or a speculator) and seller of decedent's fractional interests in the art would know of the Elkins children's strong desire to own the art in whole. Therefore, the buyer and seller would recognize the former's ability to drive "a

---

[20] For a general discussion of cases involving assemblage and other special needs values, see John A. Bogdanski, Federal Tax Valuation, para. 2.01[2][c], at 2–32 through 2–37 (2012).

hard bargain" in negotiating a resale of that art to the children.[21]

Moreover, the hypothetical buyer-collector might very well be content to possess the art for 73.055% (or 50%) of each year. In his written report, Mr. Nash states:

> It is not uncommon for two museums, acting together, to buy a work of art. * * * They each take turns in exhibiting the works in proportion to their interests. This would not work in this circumstance because the other owners would be the Elkins Children, and not another museum or institution. Consequently, museums would not be interested in purchasing the interest.

Mr. Nash offers no reason for his conclusion that a museum would not be as willing to share ownership with the Elkins children as it would with another museum or institution, nor do we see one. Moreover, we see no basis for concluding that only a museum jointly owning art with another museum would be content to retain its fractional interest and shared right of possession with another joint owner for an indefinite period. The point, of course, is that a hypothetical buyer-collector, in no rush to sell his or her acquired interests in the art, would be in an even stronger bargaining position than a speculator or art dealer in negotiating a purchase price with the Elkins children.

In short, we find petitioners' experts' analyses and conclusions to be unreliable because they are based, in large part, on the false or at least highly dubious assumption that the Elkins children would mount an unrelenting defense of the status quo, ignoring the very high probability that, instead,

---

[21] We note that the Commissioner made a similar argument in *Estate of Bright*, 658 F.2d at 1007. In that case, the decedent owned 27½% of the common stock of a closely held corporation. Her surviving husband (Mr. Bright) also owned 27½%, and an unrelated party (Mr. Schiff) owned 30%. The Commissioner argued that the decedent's 27½% interest "offered by the 'willing seller' would provide the margin of control for either Mr. Bright or Mr. Schiff, and that the 'willing buyer' might negotiate a resale to either". The Commissioner argued that those facts constituted "relevant facts" that "might affect the value of * * * [the decedent's] 27½% minority interest which is to be valued." The Commissioner stressed that "the 'willing buyer-seller' rule renders irrelevant only the real seller and buyer, not the other stockholders." *Id.* The Court of Appeals for the Fifth Circuit, after noting that "a few cases have acknowledged the relevance of such facts", declined to consider the Commissioner's argument because he made it for the first time on appeal. *Id.* at 1007–1008.

the children would seek to purchase the hypothetical buyer's interests in the art. Because we reject that assumption, we find Mr. Mitchell's discounted values for the art to be unrealistically low. [22]

c. *Conclusion*

Petitioners argue that the Elkins children would spend whatever was necessary to retain their minority (or 50%) interests in the art. It is much more likely, however, that, given their undisputed financial resources to do so, they would be willing to spend even more to acquire decedent's fractional interests therein and thereby preserve for themselves 100% ownership and possession of the art. The question is how much more.

We believe that a hypothetical willing buyer and seller of decedent's interests in the art would agree upon a price at or fairly close to the pro rata fair market value of those interests. Because the hypothetical seller and buyer could not be certain, however, regarding the Elkins children's intentions, i.e., because they could not be certain that the Elkins children would seek to purchase the hypothetical buyer's interests in the art rather than be content with their existing fractional interests, and because they could not be certain that, if the Elkins children did seek to repurchase decedent's interests in the art, they would agree to pay the full pro rata fair market value for those interests, we conclude that a nominal discount from full pro rata fair market value is appropriate.

---

[22] Our analysis renders moot the dispute between the parties over whether it is proper to assume that the hypothetical buyer might be a collector purchasing multiple works of art who opts to institute a partition in kind, which, if true, would reduce the hypothetical buyer's potential partition costs. Because the hypothetical willing buyer and seller would consider a resale of decedent's interests in the art to the Elkins children to be the most likely alternative in arriving at a price for those interests, and because that price, in our view, would exceed even Mr. Miller's worst case estimate of total partition costs ($11 million plus), it is unlikely that potential partition costs would become a significant factor in the negotiations. For the same reason, the probability, discussed by Mr. Miller, that, under Texas law, the restriction on sales provision in para. 7 of the cotenants' agreement will constitute an implied waiver of the right to partition, is not a significant factor in valuing the cotenant art.

We hold that, in order to account for the foregoing uncertainties, a hypothetical buyer and seller of all or a portion of decedent's interests in the art would agree to a 10% discount from pro rata fair market value in arriving at a purchase price for those interests. We believe that a 10% discount would enable a hypothetical buyer to assure himself or herself of a reasonable profit on a resale of those interests to the Elkins children.

## VI. *Conclusion*

Petitioners are entitled to a 10% discount from pro rata fair market value with respect to decedent's interests in the art.

A list of the 64 works of art, decedent's pro rata share of the stipulated fair market value of each work, and the resulting fair market value of each work, for Federal estate tax purposes, after applying the 10% discount permitted herein, is attached to this Opinion as appendix C.

*Decision will be entered under Rule 155.*

-------

### APPENDIX A

THE GRIT ART

| Item | Artist | Title/year/description/size | Stipulated fair market value |
|---|---|---|---|
| 1 | Pollock, Jackson | Untitled, Number 21, 1949 (Oil & enamel paper on masonite, 19¼" × 26¾") | $6,000,000 |
| 2 | Moore, Henry | Two-Piece Reclining Figure No. 3, 1961 (Bronze, 59" × 113" × 54") | 4,000,000 |
| 3 | Picasso, Pablo | Baigneuse debout, 1925 (Brush & ink on paper, 42" × 26½") | 600,000 |
| | Total | | 10,600,000 |

THE DISCLAIMER ART

| Item | Artist | Title/year/description/size | Stipulated fair market value |
|---|---|---|---|
| 4 | Johns, Jasper | Figure 4, 1967 (Oil, encaustic & newspaper on canvas, 53½" × 41½") | $8,000,000 |

| Item | Artist | Title/year/description/size | Stipulated fair market value |
|---|---|---|---|
| 5 | Francis, Sam | Green Gold, 1956 (Oil on canvas, 105" × 78") | 2,500,000 |
| 6 | Motherwell, Robert | Elegy to Spanish Republic #134, 1976 (Acrylic on canvas, 72" × 84") | 1,500,000 |
| 7 | Twombly, Cy | Untitled, 1971 (Oil-based house paint, wax crayon, & pencil on canvas, 69" × 49½") | 1,500,000 |
| 8 | Hockney, David | Pool on Sprayed Blue Paper...1978 (Colored & pressed paper pulp in 6 sheets, 72" × 85") | 900,000 |
| 9 | Kelly, Ellsworth | Yellow Panel, 1985 (Oil on canvas, 108" × 104½") | 800,000 |
| 10 | Moore, Henry | Standing Figure (Internal Form) (Bronze w/green patina, 57½" high) | 600,000 |
| 11 | Cezanne, Paul | Pot de geraniums, ca. 1885 (Water-color on paper, 12¾" × 10¼") | 550,000 |
| 12 | Soulages, Pierre | 8 June 61, 1961 (Oil on canvas, 81½" × 57½") | 550,000 |
| 13 | Magritte, Rene | La lecon des tenebres, 1964 (Gouache on paper, 13½" × 21½") | 450,000 |
| 14 | Albers, Joseph | Study for Homage to a Square in White Light, 1968 (Oil on mason-ite, 24" × 24") | 400,000 |
| 15 | Johns, Jasper | Three Flags, 1977 (Ink on plastic, image: 6⅞" × 9⅞"; 12½" × 18⅛") | 400,000 |
| 16 | Hofmann, Hans | Adagio, 1962 (Oil on canvas, 48" × 36") | 375,000 |
| 17 | Louis, Morris | Delta Epsilon, 1960 (Acrylic on can-vas, 103" × 150") | 375,000 |
| 18 | Ernst, Max | The Elements..., 1962 (Oil on can-vas, 45¼" × 35") | 350,000 |
| 19 | Moore, Henry | Family Group, 1944 (Bronze w/green patina, height 6") | 350,000 |
| 20 | De Kooning, William | Woman in a Garden, 1968 (Oil on paper on canvas, 24⅜" × 19⅜") | 300,000 |
| 21 | Louis, Morris | Achenar, 1962 (Acrylic on canvas, 79½" × 13¾") | 220,000 |
| 22 | Moore, Henry | Working Model for Thin Reclining Figure, 1978 (Bronze w/brown patina, 29" long) | 200,000 |
| 23 | Frankenthaler, Helen | Fathom, 1983 (Acrylic on canvas, 79"× 93") | 180,000 |
| 24 | Bravo, Claudio | Blue and Brown Package, 1971 (Oil on canvas, 59" × 78") | 950,000 |
| 25 | Bravo, Claudio | Wrapped Canvas, 1973 (Oil on can-vas, 79" × 47") | 950,000 |
| 26 | Bravo, Claudio | Silver and Gold, 1972 (Oil on can-vas, 44" × 57") | 300,000 |
| 27 | Rickey, George | Untitled (Open Rectangles), ca. 1985 (Stainless steel, 180" × 34" × 34") | 300,000 |
| 28 | Botero, Fernando | Parrot, 1981 (Bronze w/green pat-ina, 58" high) | 200,000 |
| 29 | Kline, Franz | The Hill, 1959 (Oil on paper, 11⅝" × 9") | 200,000 |
| 30 | Hofmann, Hans | Untitled (M–418), 1964 (Oil on can-vas, 30" × 25") | 150,000 |
| 31 | Olitski, Jules | Carnegie Hall, ca. 1962–64 (Acrylic on canvas, 64" × 76½") | 150,000 |

| Item | Artist | Title/year/description/size | *Stipulated fair market value* |
|------|--------|------------------------------|------------------|
| 32 | Hockney, David | Nichols Canyon Road, Hollywood Boulevard, 1979 (Watercolor and ink on paper, 23¼" × 18") | 140,000 |
| 33 | Heizer, Michael | Untitled, ca. 1985 (Cast stone, 24' × 20') | 100,000 |
| 34 | Di Suvero, Mark | Untitled, ca. 1968 (Steel on mirror plate, sculpture: 18½" × 42"; Plate: ⅛" × 46" × 22") | 90,000 |
| 35 | Bertoia, Harry | Sunburst, 1972 (Brass & bronze suspended mobile, 28" × 28" × 28") | 80,000 |
| 36 | Frankenthaler, Helen | Untitled, ca. 1975 (Watercolor on paper, 59" × 78") | 60,000 |
| 37 | Bertoia, Harry | Untitled (Sounding Sculpture), 1968 (Bronze, 84" × 10" × 10") | 50,000 |
| 38 | Motherwell, Robert | In green with Two Scarlet Spots, 1967 (Paper collage, acrylic & charcoal on paper, 30" × 22") | 50,000 |
| 39 | Held, Al | North by Northwest, 1973 (Acrylic on canvas, 72" × 96") | 42,000 |
| 40 | Hofmann, Hans | Untitled, 1949 (Oil and ink on paper, 17" × 14") | 40,000 |
| 41 | Dine, Jim | Tie, 1961 (Oil & pastel on paper, 23½" × 16") | 35,000 |
| 42 | Bertoia, Harry | Untitled (Stainless & steel wire, 37" × 20") | 30,000 |
| 43 | Frankenthaler, Helen | Canal Street VIII, 1987 (Watercolor & gouache on paper, 25½" × 19¾") | 25,000 |
| 44 | Craig-Martin, Michael | Safety Pin, circa 1990 (Painted steel & wood, 100" × 88" × 13") | 22,000 |
| 45 | Hofmann, Hans | Untitled (N–677–2), 1956 (Gouache on paper, 22¼" × 28¼") | 20,000 |
| 46 | Hofmann, Hans | Fluse #12 (M–1351), 1962 (Oil on canvas board, 13¼" × 11½") | 20,000 |
| 47 | Nagare, Masayuki | Destination, 1996 (Granite, 26½" × 12" × 8") | 18,000 |
| 48 | Motherwell, Robert | Je t'aime avec noir, 1978 (Ink & pencil on tracing paper, 13½" × 16¾") | 15,000 |
| 49 | Graves, Nancy | Four Times Four, 1977 (Acrylic on canvas, 64" × 64") | 8,000 |
| 50 | Hofmann, Hans | Untitled, 1954 (Gouache on paper, 12½" × 9½") | 6,000 |
| 51 | Frankenthaler, Helen | Thanksgiving Day, 1980 (Hand-painted ceramic tile, 13½" × 19") | 4,000 |
| 52 | Frankenthaler, Helen | Thanksgiving Day, ca. 1980 (Hand-painted, ceramic tile, 13½"× 17") | 4,000 |
| 53 | N/A | Japanese Painted and Silvered Paper Four-Panel Screen, 3d Quarter, 19th Century (Silvered paper with silk-framed border; each panel: 52" × 23") | 4,000 |
| 54 | Frankenthaler, Helen | Hand Painted Book Cover #11, 1970 (Acrylic on canvas, 11" × 12") | 3,500 |
| 55 | Graves, Nancy | Omon (Series E) 1976 (Wax crayon on paper, 35" × 47¼") | 3,000 |
| 56 | Meadmore, Clement | Untitled, 1992 (Bronze, Height: 8½") | 3,000 |
| 57 | Noland, Kenneth | Hand Painted Bookcover, 1977 (Acrylic on canvas, 11" × 12") | 2,000 |

| Item | Artist | Title / year / description / size | *Stipulated fair market value* |
|---|---|---|---|
| 58 | Hamilton, Juan | Abstract Form #52, 1975 (Height: 14½") | 1,750 |
| 59 | Love, Jim | Monday Morning: What to do...What to do, 1992 (Welded steel, 8" × 8") | 1,200 |
| 60 | Love, Jim | Looking for Santa Claus (Welded steel, 9⅜" × 8") | 1,200 |
| 61 | Stella, Frank | Pastel Stack, 1970 (28" × 41") | 900 |
| 62 | Fuller, Sue | String Composition #213, 1963 (Nylon & Saran thread with Plexiglas, 36" × 36") | 750 |
| 63 | N/A | Sepik River Carved Polychrome Wood Mask, 20th Century (Height: 64"; Width: 22") | 250 |
| 64 | N/A | Sepik River Carved and Polychrome-Painted Wood Shield, 20th Century (Height: 69½"; Width: 14") | 100 |
| | Total | | 24,580,650 |

## APPENDIX B

| Nash category | Artist | Title / year | Option 1 discount | Option 2 discount | Concluded discount | *Fair market value of interest* |
|---|---|---|---|---|---|---|
| I | Johns, J. | Figure 4, 1967 | 71.72% | 70.31% | 70.31% | $1,735,188 |
| I | Pollock, J. | Untitled, Number 21, 1949 | 51.69 | 59.68 | 51.69 | 1,449,210 |
| I | Moore, H. | Two-Piece Reclining Figure No. 3, 1961 | 51.69 | 66.89 | 51.69 | 966,140 |
| I | Francis, S. | Green Gold, 1956 | 65.78 | 68.95 | 65.78 | 624,926 |
| I | Motherwell, R. | Elegy to Spanish Republic #134, 1976 | 65.78 | 84.64 | 65.78 | 374,956 |
| II | Twombly, C. | Untitled, 1971 | 71.08 | 84.64 | 71.08 | 316,948 |
| II | Hockney, D. | Pool on Sprayed Blue Paper..., 1978 | 71.08 | 100.00 | 71.08 | 190,169 |
| III | Bravo, C. | Blue and Brown Package, 1971 | 79.74 | 100.00 | 79.74 | 140,640 |
| III | Bravo, C. | Wrapped Canvas, 1973 | 79.74 | 100.00 | 79.74 | 140,640 |
| II | Kelly, E. | Yellow Panel, 1985 | 71.08 | 67.43 | 67.43 | 190,350 |
| II | Moore, H. | Standing Figure (Internal Form) | 71.08 | 75.70 | 71.08 | 126,779 |
| II | Cezanne, P. | Pot de geraniums, ca. 1885 | 71.08 | 79.90 | 71.08 | 116,214 |
| II | Soulages, P. | 8 June 61, 1961 | 71.08 | 80.00 | 71.08 | 116,214 |
| II | Magritte, R. | La lecon des tenebres, 1964 | 71.08 | 91.19 | 71.08 | 95,084 |
| II | Picasso, P. | Baigneuse debout, 1925 | 71.08 | 96.83 | 71.08 | 86,770 |
| II | Albers, J. | Study for Homage to a Square in White Light, 1968 | 71.08 | 98.98 | 71.08 | 84,519 |
| II | Johns, J. | Three Flags, 1977 | 71.08 | 98.98 | 71.08 | 84,519 |
| II | Hofmann, H. | Adagio, 1962 | 71.08 | 100.00 | 71.08 | 79,237 |
| II | Louis, M. | Delta Epsilon, 1960 | 71.08 | 100.00 | 71.08 | 79,237 |
| II | Ernst, M. | The Elements..., 1962 | 71.08 | 100.00 | 71.08 | 73,954 |
| II | Moore, H. | Family Group, 1944 | 71.08 | 100.00 | 71.08 | 73,954 |
| II | De Kooning, W. | Woman in a Garden, 1968 | 71.08 | 100.00 | 71.08 | 63,390 |
| II | Louis, M. | Achenar, 1962 | 71.08 | 100.00 | 71.08 | 46,486 |
| II | Moore, H. | Working Model for Thin Reclining Figure, 1978 | 71.08 | 100.00 | 71.08 | 42,260 |
| II | Frankenthaler, H. | Fathom, 1983 | 71.08 | 100.00 | 71.08 | 38,034 |
| III | Bravo, C. | Silver and Gold, 1972 | 79.74 | 100.00 | 79.74 | 44,413 |
| III | Rickey, G. | Untitled (Open Rectangles), ca. 1985 | 79.74 | 100.00 | 79.74 | 44,413 |
| III | Botero, F. | Parrot, 1981 | 79.74 | 100.00 | 79.74 | 29,608 |
| III | Kline, F. | The Hill, 1959 | 79.74 | 100.00 | 79.74 | 29,608 |
| III | Hofmann, H. | Untitled (M–418), 1964 | 79.74 | 100.00 | 79.74 | 22,206 |
| III | Olitski, J. | Carnegie Hall, ca. 1962–64 | 79.74 | 100.00 | 79.74 | 22,206 |

| Nash category | Artist | Title/year | Option 1 discount | Option 2 discount | Concluded discount | Fair market value of interest |
|---|---|---|---|---|---|---|
| III | Hockney, D. | Nichols Canyon Road, Hollywood Boulevard, 1979 | 79.74 | 100.00 | 79.74 | 20,726 |
| III | Heizer, M. | Untitled, ca. 1985 | 79.74 | 100.00 | 79.74 | 14,804 |
| III | Di Suvero, M. | Untitled, ca. 1968 | 79.74 | 100.00 | 79.74 | 13,324 |
| III | Bertoia, H. | Sunburst, 1972 | 79.74 | 100.00 | 79.74 | 11,843 |
| III | Frankenthaler, H. | Untitled, ca. 1975 | 79.74 | 100.00 | 79.74 | 8,883 |
| III | Bertoia, H. | Untitled (Sounding Sculpture), 1968 | 79.74 | 100.00 | 79.74 | 7,402 |
| III | Motherwell, R. | In green with Two Scarlet Spots, 1967 | 79.74 | 100.00 | 79.74 | 7,402 |
| III | Held, A. | North by Northwest, 1973 | 79.74 | 100.00 | 79.74 | 6,218 |
| III | Hofmann, H. | Untitled, 1949 | 79.74 | 100.00 | 79.74 | 5,922 |
| III | Dine, J. | Tie, 1961 | 79.74 | 100.00 | 79.74 | 5,181 |
| III | Bertoia, H. | Untitled | 79.74 | 100.00 | 79.74 | 4,441 |
| III | Frankenthaler, H. | Canal Street VIII, 1987 | 79.74 | 100.00 | 79.74 | 3,701 |
| III | Craig-Martin, M. | Safety Pin, ca. 1990 | 79.74 | 100.00 | 79.74 | 3,257 |
| III | Hofmann, H. | Untitled (N–677–2), 1956 | 79.74 | 100.00 | 79.74 | 2,961 |
| III | Hofmann, H. | Fluse #12 (M–1351), 1962 | 79.74 | 100.00 | 79.74 | 2,961 |
| III | Nagare, M. | Destination, 1996 | 79.74 | 100.00 | 79.74 | 2,665 |
| III | Motherwell, R. | Je t'aime avec noir, 1978 | 79.74 | 100.00 | 79.74 | 2,221 |
| III | Graves, N. | Four Times Four, 1977 | 79.74 | 100.00 | 79.74 | 1,184 |
| III | Hofmann, H. | Untitled, 1954 | 79.74 | 100.00 | 79.74 | 888 |
| III | Frankenthaler, H. | Thanksgiving Day, 1980 | 79.74 | 100.00 | 79.74 | 592 |
| III | Frankenthaler, H. | Thanksgiving Day, ca. 1980 | 79.74 | 100.00 | 79.74 | 592 |
| III | N/A | Japanese Painted and Silvered Paper Four-Panel Screen, 3d Quarter, 19th Century | 79.74 | 100.00 | 79.74 | 592 |
| III | Frankenthaler, H. | Hand Painted Book Cover #11, 1970 | 79.74 | 100.00 | 79.74 | 518 |
| III | Graves, N. | Omon (Series E), 1976 | 79.74 | 100.00 | 79.74 | 444 |
| III | Meadmore, C. | Untitled, 1992 | 79.74 | 100.00 | 79.74 | 444 |
| III | Noland, K. | Hand Painted Bookcover, 1977 | 79.74 | 100.00 | 79.74 | 296 |
| III | Hamilton, J. | Abstract Form #52, 1975 | 79.74 | 100.00 | 79.74 | 259 |
| III | Love, J. | Monday Morning: What to do...What to do, 1992 | 79.74 | 100.00 | 79.74 | 178 |
| III | Love, J. | Looking for Santa Claus | 79.74 | 100.00 | 79.74 | 178 |
| III | Stella, F. | Pastel Stack, 1970 | 79.74 | 100.00 | 79.74 | 133 |
| III | Fuller, S. | String Composition #213, 1963 | 79.74 | 100.00 | 79.74 | 111 |
| III | N/A | Sepik River Carved Polychrome Wood Mask, 20th Century | 79.74 | 100.00 | 79.74 | 37 |
| III | N/A | Sepik River Carved and Polychrome-Painted Wood Shield, 20th Century | 79.74 | 100.00 | 79.74 | 15 |

## APPENDIX C

## VALUES OF DECEDENT'S INTERESTS IN THE 64 WORKS OF ART FOR FEDERAL ESTATE TAX PURPOSES

| Item | Artist | Title/year | Decedent's pro rata share of stipulated fair market value[1] | Fair market value of decedent's interest after application of 10% discount |
|---|---|---|---|---|
| 1 | Pollock, Jackson | Untitled, Number 21, 1949 | $3,000,000 | $2,700,000 |
| 2 | Moore, Henry | Two-Piece Reclining Figure No. 3, 1961 | 2,000,000 | 1,800,000 |
| 3 | Picasso, Pablo | Baigneuse debout, 1925 | 300,000 | 270,000 |
| 4 | Johns, Jasper | Figure 4, 1967 | 5,844,400 | 5,259,960 |
| 5 | Francis, Sam | Green Gold, 1956 | 1,826,375 | 1,643,738 |

| Item | Artist | Title/year | Decedent's pro rata share of stipulated fair market value[1] | Fair market value of decedent's interest after application of 10% discount |
|---|---|---|---|---|
| 6 | Motherwell, Robert | Elegy to Spanish Republic #134, 1976 | 1,095,825 | 986,243 |
| 7 | Twombly, Cy | Untitled, 1971 | 1,095,825 | 986,243 |
| 8 | Hockney, David | Pool on Sprayed Blue Paper...1978 | 657,495 | 591,746 |
| 9 | Kelly, Ellsworth | Yellow Panel, 1985 | 584,440 | 525,996 |
| 10 | Moore, Henry | Standing Figure (Internal Form) | 438,330 | 394,497 |
| 11 | Cezanne, Paul | Pot de geraniums, ca. 1885 | 401,803 | 361,623 |
| 12 | Soulages, Pierre | 8 June 61, 1961 | 401,803 | 361,623 |
| 13 | Magritte, Rene | La lecon des tenebres, 1964 | 328,748 | 295,873 |
| 14 | Albers, Joseph | Study for Homage to a Square in White Light, 1968 | 292,220 | 262,998 |
| 15 | Johns, Jasper | Three Flags, 1977 | 292,220 | 262,998 |
| 16 | Hofmann, Hans | Adagio, 1962 | 273,956 | 246,560 |
| 17 | Louis, Morris | Delta Epsilon, 1960 | 273,956 | 246,560 |
| 18 | Ernst, Max | The Elements..., 1962 | 255,693 | 230,124 |
| 19 | Moore, Henry | Family Group, 1944 | 255,693 | 230,124 |
| 20 | De Kooning, William | Woman in a Garden, 1968 | 219,165 | 197,249 |
| 21 | Louis, Morris | Achenar, 1962 | 160,721 | 144,649 |
| 22 | Moore, Henry | Working Model for Thin Reclining Figure, 1978 | 146,110 | 131,499 |
| 23 | Frankenthaler, Helen | Fathom, 1983 | 131,499 | 118,349 |
| 24 | Bravo, Claudio | Blue and Brown Package, 1971 | 694,023 | 624,621 |
| 25 | Bravo, Claudio | Wrapped Canvas, 1973 | 694,023 | 624,621 |
| 26 | Bravo, Claudio | Silver and Gold, 1972 | 219,165 | 197,249 |
| 27 | Rickey, George | Untitled (Open Rectangles), ca. 1985 | 219,165 | 197,249 |
| 28 | Botero, Fernando | Parrot, 1981 | 146,110 | 131,499 |
| 29 | Kline, Franz | The Hill, 1959 | 146,110 | 131,499 |
| 30 | Hofmann, Hans | Untitled (M–418), 1964 | 109,583 | 98,625 |
| 31 | Olitski, Jules | Carnegie Hall, ca. 1962–64 | 109,583 | 98,625 |
| 32 | Hockney, David | Nichols Canyon Road, Hollywood Boulevard, 1979 | 102,277 | 92,049 |
| 33 | Heizer, Michael | Untitled, ca. 1985 | 73,055 | 65,750 |
| 34 | Di Suvero, Mark | Untitled, ca. 1968 | 65,750 | 59,175 |
| 35 | Bertoia, Harry | Sunburst, 1972 | 58,444 | 52,600 |
| 36 | Frankenthaler, Helen | Untitled, ca. 1975 | 43,833 | 39,450 |
| 37 | Bertoia, Harry | Untitled (Sounding Sculpture), 1968 | 36,528 | 32,875 |
| 38 | Motherwell, Robert | In green with Two Scarlet Spots, 1967 | 36,528 | 32,875 |
| 39 | Held, Al | North by Northwest, 1973 | 30,683 | 27,615 |
| 40 | Hofmann, Hans | Untitled, 1949 | 29,222 | 26,300 |
| 41 | Dine, Jim | Tie, 1961 | 25,569 | 23,012 |
| 42 | Bertoia, Harry | Untitled | 21,917 | 19,725 |
| 43 | Frankenthaler, Helen | Canal Street VIII, 1987 | 18,264 | 16,438 |
| 44 | Craig-Martin, Michael | Safety Pin, ca. 1990 | 16,072 | 14,465 |
| 45 | Hofmann, Hans | Untitled (N–677–2), 1956 | 14,611 | 13,150 |
| 46 | Hofmann, Hans | Fluse #12 (M–1351), 1962 | 14,611 | 13,150 |
| 47 | Nagare, Masayuki | Destination, 1996 | 13,150 | 11,835 |
| 48 | Motherwell, Robert | Je t'aime avec noir, 1978 | 10,958 | 9,862 |
| 49 | Graves, Nancy | Four Times Four, 1977 | 5,844 | 5,260 |
| 50 | Hofmann, Hans | Untitled, 1954 | 4,383 | 3,945 |
| 51 | Frankenthaler, Helen | Thanksgiving Day, 1980 | 2,922 | 2,630 |
| 52 | Frankenthaler, Helen | Thanksgiving Day, ca. 1980 | 2,922 | 2,630 |
| 53 | N/A | Japanese Painted and Silvered Paper Four-Panel Screen, 3d Quarter, 19th Century | 2,922 | 2,630 |
| 54 | Frankenthaler, Helen | Hand Painted Book Cover #11, 1970 | 2,557 | 2,301 |
| 55 | Graves, Nancy | Omon (Series E), 1976 | 2,192 | 1,973 |
| 56 | Meadmore, Clement | Untitled, 1992 | 2,192 | 1,973 |
| 57 | Noland, Kenneth | Hand Painted Bookcover, 1977 | 1,461 | 1,315 |
| 58 | Hamilton, Juan | Abstract Form #52, 1975 | 1,278 | 1,150 |

| Item | Artist | Title/year | Decedent's pro rata share of stipulated fair market value[1] | Fair market value of decedent's interest after application of 10% discount |
|---|---|---|---|---|
| 59 | Love, Jim | Monday Morning: What to do...What to do, 1992 | 877 | 789 |
| 60 | Love, Jim | Looking for Santa Claus | 877 | 789 |
| 61 | Stella, Frank | Pastel Stack, 1970 | 657 | 591 |
| 62 | Fuller, Sue | String Composition #213, 1963 | 548 | 493 |
| 63 | N/A | Sepik River Carved Polychrome Wood Mask, 20th Century | 183 | 165 |
| 64 | N/A | Sepik River Carved and Polychrome-Painted Wood Shield, 20th Century | 73 | 66 |

[1] Decedent's share of agreed fair market value with respect to items 1 through 3 is 50%. For all other items, it is 73.055%.